**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Victor CABAN, Defendant–Appellant.**

**No. 91–1150.**

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1992.

Decided May 4, 1992.

Paul Kanter, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Robert A. Adman (argued), Appleton, Wis., for defendant-appellant.

Before CUMMINGS and POSNER, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

CUMMINGS, Circuit Judge.

On September 17, 1990, Victor Caban pleaded guilty to a charge of conspiracy to distribute cocaine in violation of 21 U.S.C.

§ 841(a)(1).[1] The district court scheduled sentencing for December 20, 1990. At that hearing, Caban, proclaiming his innocence, attempted to withdraw his guilty plea. Caban's attorney, Michael Backes, described by appellate counsel as a "very experienced trial lawyer," stated that he feared he did not provide effective representation for the defendant. The court continued the sentencing hearing until January 10, 1991, in order to review the transcript of the plea hearing. The district court denied Caban's motion to withdraw his plea, and Caban now appeals that determination. In addition, Caban appeals his sentence, challenging the district court's findings as to the amount of narcotics involved in the conspiracy.

## I. FACTS

### A. The Events Leading to the Charges

According to the government, law enforcement officials in Texas and Milwaukee, Wisconsin, conducted a joint drug investigation focusing on Victor Caban.[2] Fred Tietz, an investigator from the Wharton County, Texas, Sheriff's Department initiated several phone conversations with Caban in Milwaukee. The parties negotiated, and in April 1990 Caban agreed to purchase twenty kilograms of cocaine and one thousand pounds of marijuana from Tietz in Texas. The narcotics were to be transported from Texas to Milwaukee in May. Caban was arranging to sell the drugs to some Milwaukee individuals.

On May 16, 1990, Drug Enforcement Agents arranged to meet Caban at a Milwaukee restaurant parking lot to show him the drugs. Caban entered a van driven by the DEA agents, viewed twenty kilograms of narcotics, and sampled some cocaine. Negotiations continued that day, and the parties agreed to the delivery of the drugs on May 17. Caban, co-defendant Juan Rodriguez and the ultimate purchasers of the drugs, co-defendants Charles Powell and Rufus Dunlap, met at Jose Gonzalez's Milwaukee apartment. Dunlap and Powell brought $150,000 to pay for five kilograms of cocaine. An undercover agent went to the apartment and asked Dunlap to go outside to a car and view the drugs. After Dunlap saw the narcotics, he was arrested. Caban and co-defendant Rodriguez were arrested as they attempted to flee from the back exit of the apartment. Co-defendant Powell was found in the apartment, with $150,000 lying on the floor near him.[3] Caban wrote a letter to the district court, which was attached to his presentence report, narrating his own version of the events. Caban stated that an individual named Roberto Miranda contacted him and offered him a job selling Mexican food, namely jalapeno peppers and hot sauce, that would be sent from Texas. Miranda came to Caban's house and stated that before they would give him the job, Caban had to meet with Miranda's boss, who arranged to come to Milwaukee from Texas. On May 16, Caban met with Miranda and "his boss" who was actually DEA agent Ray Melnik. They asked Caban to go to a van to view the "products." Caban claims that once he discovered that the products were actually narcotics, he refused to have anything to do with the deal. Caban asserts that Melnik called him twice asking him to buy the drugs, but Caban hung up on him. The third time he received a call, "I told him I had someone to bye [sic] 10 kilos to calm Roberto's boss down."

In his first letter to the judge, Caban claims that on May 17, 1989, he was contacted by co-defendant Rodriguez who said

---

**1.** In accordance with the plea agreement, the district court dismissed three counts of the indictment which alleged that Caban attempted to possess with the intent to deliver cocaine, conspiracy to distribute marijuana and attempt to possess with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

**2.** The government's version of the events has been gleaned from the factual basis recited at the plea hearing held on September 17, 1989.

At this hearing, Caban agreed that the government's account was accurate.

**3.** The record reflects that another co-defendant, Numberto Andino, was waiting at Caban's apartment with an additional $100,000 in cash for the purchase of four kilograms of cocaine. This evidence, however, was not presented at the plea hearing.

that a friend wanted Caban's band to play at the grand opening of a bar. They both walked over to Jose Gonzalez's apartment. When he noticed a lot of money on the floor, Caban tried to leave. He said that Rodriguez blocked his way to the front door, so that he went to the back door and left. He was immediately arrested by police officers. Caban denied knowledge that a drug deal was to take place. Because he was told that he faced 80 years in prison on the four counts charged in the indictment, he agreed to plead guilty so that he would only receive ten.

### B. The Motion To Withdraw

On September 17, 1990, Caban pleaded guilty to conspiracy to distribute cocaine, acknowledging the government's version of the facts. The transcript reveals, and Caban concedes, that the hearing conformed with Federal Rule of Criminal Procedure 11.

A sentencing hearing was held on December 20, 1990. Caban's attorney, Michael Backes, requested to be allowed to withdraw as counsel and made an oral motion to withdraw Caban's guilty plea. Backes stated that he feared he did not provide effective assistance of counsel, noting that he believed that he and Caban had some serious communication problems. Backes questioned his own evaluation of the evidence against Caban. Coupled with Caban's persistent claim of innocence, Backes doubted whether he properly recommended that Caban accept the plea offer. Attorney Backes also noted that he questioned whether he appropriately handled post-plea meetings between Caban and DEA agents in an attempt to earn a downward departure for Caban's cooperation. The district court denied Backes' motion to withdraw as counsel and Caban's motion to withdraw his guilty plea, but continued the sentencing proceeding until a later date so that he could review the transcript of the plea proceedings.

The sentencing phase resumed on January 10, 1991. Attorney Backes again renewed his motions to withdraw as counsel and to allow Caban to withdraw his guilty plea. This time, Backes stated that he maintained serious doubts as to his client's competence. Thus he argued that although the plea transcript itself appeared proper, he questioned whether Caban understood the plea proceeding. The court then addressed the defendant who stated that he did not understand the proceeding and that his counsel and the United States Attorney coerced him into pleading guilty. Following this colloquy with the defendant, the court denied the motions stating:

> Mr. Caban, you just washed yourself out. After receiving your [second] letter,[4] I was very tempted to grant the request and to put the taxpayers to the expense of appointing another lawyer for you so that he or she could investigate this matter more fully to determine if there was a basis for it. But now when you come in here after I spent over an hour with you at your plea agreement [sic] and tell me that you didn't understand what was going on, you didn't understand you were under oath and didn't understand you had to tell the truth, that is so far fetched that it destroys whatever credibility might have been left in your [second] letter. (Tr. of January 10, 1990 at 10–11).

The court accepted the findings in the presentence report, which stated that Caban conspired to distribute over twenty kilograms of cocaine and five hundred pounds of marijuana, mandating a base offense level of 34. After factoring in Caban's criminal history category, the court determined that the guidelines provided a sentencing range of 151 to 188 months of imprisonment. Caban never objected to the district court's calculations. The court sentenced Caban to serve 175 months in prison.

---

**4.** According to the transcript, Caban wrote another letter which the court received on the morning of this hearing. He asked that the letter be read into the record. The court stated

that reading the letter was unnecessary because the letter itself would be part of the record. The letter does not appear to be part of the record.

## II.  ANALYSIS

### A.  Refusal to Grant Motion
### to Withdraw Plea

Caban, represented by new counsel on appeal, claims that the district court abused its discretion by refusing to grant his motion to withdraw his guilty plea pursuant to Rule 32(d).[5] He contends that the record clearly demonstrates an entrapment defense to these charges. Caban also argues that an abuse of discretion is demonstrated by the district court's failure to undertake a serious inquiry and make findings of fact concerning trial counsel's effectiveness.

■■ "A defendant does not have an absolute right to withdraw his guilty plea, and the decision whether to allow him to do so is with the sound discretion of the trial court." *United States v. McFarland,* 839 F.2d 1239, 1241 (7th Cir.1988). We will reverse a denial of a motion to withdraw a guilty plea only upon a showing that the court abused its discretion. Thus a defendant must show that "fair and just reason" exists justifying his request for withdrawal, and that the district court's findings to the contrary are clearly erroneous. A district court need not conduct a hearing "when the allegations contained in the motion to withdraw the plea are mere conclusions or are inherently unreliable." *United States v. Ray,* 828 F.2d 399, 422 (7th Cir.1987) (quoting *United States v. Fountain,* 777 F.2d 351, 358 (7th Cir.1985)).

■■ Caban seems to argue that counsel's ineffectiveness is demonstrated by his failure to recognize a possible entrapment defense to the charges.[6] If Caban's version of events is accepted, there is some basis to the claim of a possible entrapment

defense. However, the court rejected Caban's credibility. Even had the court not done so, it is questionable whether Caban could avail himself of an entrapment defense. "[W]here the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition." *Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 147 (1992). Caban states that he initially refused to have any participation in the drug deal. However, after only three phone calls, he agreed to find persons who would buy ten kilograms of cocaine. Caban's first letter to the court ultimately denies knowledge of or participation in the drug transaction. A denial of wrongdoing cannot create the foundation for an entrapment defense. Moreover, the government presented evidence at the plea hearing demonstrating Caban's ready agreement to participate in the dealings, negating the possibility of a viable entrapment defense.

That trial counsel questioned his own effectiveness presents an interesting aspect to this case. On one hand, the parties agree that the plea hearing was thoroughly conducted by the district court. This court has held that answers provided by defendants at a plea hearing are entitled to a "presumption of verity." *United States v. Ellison,* 835 F.2d 687, 693 (7th Cir.1987) (*Ellison II*). Thus when a defendant challenges the voluntariness of such a hearing, he "faces a heavy burden of persuasion." *Id.*

To deter abuses in the withdrawal of guilty pleas under Rule 32(d), and to protect the integrity of the judicial

---

5. Rule 32(d) provides:
   If a motion for withdrawal of a plea of guilty or nolo contendere is made before sentence is imposed, the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason. At any later time, a plea may be set aside only on direct appeal or by motion under 28 U.S.C. § 2255.

6. It is not clear what present defense counsel is arguing. The two and a half page argument section discussing the entrapment defense is entitled: "The trial court abused its discretion in

denying substitute counsel and denying change of plea." Counsel may be claiming that failure to consider the entrapment defense stems from ineffective assistance of counsel. On the other hand, counsel could be arguing that the dearth of information regarding Caban's awareness of this possible defense suggests an abuse of the trial court's discretion. This abuse, presumably, stems from the district court's failure to inquire into the allegations of ineffective assistance of counsel.

process, we have held that "rational conduct requires that voluntary responses made by a defendant ... be binding." *McFarland*, 839 F.2d at 1242 (quoting *Ellison II*, 835 F.2d at 693). Consequently, if Caban is bound by his answers at the plea hearing, he cannot demonstrate that the district court abused its discretion. Further, the district judge indicated that he found Caban's account in the letters to be incredible. Because credibility determinations are left to the sound discretion of the trial court, it seems unlikely that the district court abused its discretion by rejecting Caban's motion to withdraw his plea which was based upon a version of events that the court did not find credible.

On the other hand, this is an unusual situation in which the defendant's trial counsel makes the motion below because he questions the effectiveness of his own representation. If counsel was ineffective, such actions could affect the voluntariness of the plea and provide just and fair reasons for withdrawal of the plea. Yet at the time counsel raised his own ineffectiveness, he still represented Caban in the proceedings and therefore was bound by the attorney/client privilege.

We discussed a similar situation in *United States v. Ellison*, 798 F.2d 1102 (7th Cir.1986) (*Ellison I*). In *Ellison I*, the defendant brought a Criminal Rule 32(d) motion to withdraw his guilty plea. Ellison had sent a letter to the judge claiming that his attorney advised him to plead guilty only to avoid making waves with federal prosecutors with whom the attorney would be working in the future. The same attorney represented Ellison in the Rule 32(d) proceeding. Counsel told the court that the allegations, if true, would constitute malpractice. The district court explored the ineffective assistance of counsel allegation by asking defense counsel whether his client's claims were true. This Court found that counsel labored under a conflict of interest. "Any contention by counsel that defendant's allegations were not true would (and did) contradict his client. In testifying against his client, counsel acted as both counselor and witness for the prosecution." *Ellison I*, 798 F.2d at 1107. We

held that Ellison was effectively denied his right to counsel and remanded for a new Rule 32(d) hearing with conflict-free representation for Ellison.

It is questionable whether an attorney who is alleging his own ineffectiveness could effectively represent Caban at the Rule 32(d) hearing. Like the attorney in *Ellison I*, for the issue to be adequately explored, counsel had to be both witness and defense attorney. Trial counsel requested the court to allow him to withdraw and to appoint new counsel who could "review this entire matter" and effectively represent Caban. (Tr. of December 20, 1990 at 4). Not to do so could be an abuse of discretion, but here the district court found that the defendant's version of events was incredible. Thus the court could and did properly deny the motion based on the determination that Caban's allegations, as well as those of his attorney, were "inherently unreliable." *Ray*, 828 F.2d at 422.

## III.  SENTENCING

■■■ Caban argues that the government failed to demonstrate that he conspired to distribute twenty kilograms of cocaine. Instead, he argues that the record only supports a finding that the transactions involved nine kilograms of cocaine, which would decrease Caban's base offense level by two points. Counsel below did not object to the presentence report calculation of thirty-four points, thereby waiving this issue on appeal. Therefore, unless Caban can demonstrate that the district court committed plain error, we will uphold its determination. Plain error must be "obvious as well as significantly prejudicial." *United States v. Blythe*, 944 F.2d 356, 359 (7th Cir.1991) (quoting *Peretz v. United States*, — U.S. —, 111 S.Ct. 2661, 2678, 115 L.Ed.2d 808 (1991)).

■■■ According to the government's version of events, Caban initially negotiated for the sale of twenty kilograms of cocaine and one thousand pounds of marijuana. Caban agreed at the change of plea hearing to the accuracy of this information. At

oral argument, the government concedes that Caban was not in the position to buy all twenty kilograms on May 17. On that date, Caban had only arranged for the sale of nine kilograms. However, Caban originally agreed to act as a "broker" for the sale of all twenty kilograms and was planning to sell all. This Court has upheld base offense level calculations based upon the quantity of cocaine that the parties negotiate to sell, not only the amount that is actually involved in the aborted transaction. *United States v. Macias,* 930 F.2d 567 (7th Cir.1991); *United States v. Buggs,* 904 F.2d 1070 (7th Cir.1990). There was no plain error in the district court's calculation of Caban's base offense level.

Judgment affirmed.