**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Donald M. PRICE, Jr. and Mario A. Tapia, also known as Mike Flores, also known as Mario Alejandro Tapia, Defendants–Appellants.**

Nos. 91–1257, 91–1579.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1992.

Decided March 10, 1993.

Hilary W. Frooman, Asst. U.S. Atty., Danville, IL (argued), Estaban F. Sanchez, Springfield, IL, for U.S.

Bradford E. Hunt, Alton, IL (argued), for Donald M. Price, Jr.

Joseph R. Lopez, Chicago, IL (argued) for Mario A. Tapia.

Before CUMMINGS, COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

The two defendants-appellants, Mario A. Tapia and Donald Price, along with four others, David G. Sweet, Tommy D. Underwood, Larry J. Blakney, and James Wiseman, were charged with conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. Both Price and Tapia pled guilty to conspiring to distribute between 400 and 700 kilograms of marijuana. Pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the district court sentenced Tapia to 210 months imprisonment and Price to 57 months imprisonment. Tapia appeals the district court's denial of his motion to withdraw his guilty plea, while Tapia and Price both challenge their sentences. We affirm the district court in all respects.

## I. BACKGROUND

### A. The Drug Conspiracy

The marijuana smuggling and distribution scheme was launched in 1986 when Tapia began supplying Sweet with marijuana from Mexico which Sweet in turn distributed and sold in Illinois. Sweet distributed the marijuana through Wiseman, a trafficker of illegal drugs based in the Alton, Illinois area. During 1986, Tapia helped supply Sweet with approximately eight to ten marijuana deliveries ranging in amounts from ten to twenty kilograms. During 1987, Tapia, acting as Sweet's partner, supplied Sweet with marijuana in amounts of from three to one hundred pounds. In 1988, they consummated their final deal when Tapia supplied Sweet with 11 pounds of marijuana.

Price's involvement in the conspiracy began in 1986 when he met with Underwood. Price knew that Underwood was Wiseman's cousin and that Wiseman was a marijuana dealer, and he wanted Underwood to arrange for Price to gain access to Wiseman's marijuana. Underwood agreed, and in 1986 he began receiving marijuana from Wiseman and delivering it to Price, accepting payments for the marijuana from Price, and turning the money over to Wiseman. Price then sold the marijuana to his customer Blakney.

In late 1986 or early 1987, Sweet and Underwood began dealing directly with one another, and Underwood commenced making sales directly to Blakney. Although Price had been cut out of the deal, he attempted to buy marijuana for his own "personal use" from Underwood, but was rebuffed. Tapia, who had a falling out with Sweet in 1988, thereafter took advantage of his new connections to sell marijuana directly to Underwood and Wiseman.

In January, 1990, Blakney was arrested on state charges arising from his role in the conspiracy and agreed to cooperate with law enforcement officials. The officers also persuaded Underwood to assist in their investigation. On February 20, 1990, agents of the Illinois State Police taped a conversation between Tapia and Underwood in which Tapia stated he would arrive in St. Louis, Missouri with approximately 50 pounds of marijuana. On March 9, 1990, Tapia, while under surveillance, met Underwood in St. Louis, and drove with him to Alton, Illinois, where, on the following day, Tapia was arrested after delivering a suitcase of marijuana to Underwood.

## B. Relevant District Court Proceedings

When Tapia was arrested, he told agents that his name was Mike Flores and also gave them a false social security number. At his initial appearance in court before a magistrate, Tapia once again gave his fictitious name. It took officials a week to determine Tapia's true identity through an FBI fingerprint check.

The week before Tapia was scheduled to go to trial, Tapia attempted to fire his attorney, Michael B. Metnick, because he disagreed with the advice Metnick was giving him during the plea negotiations. (Metnick had advised Tapia to "be realistic" about his chances of avoiding conviction in the face of the overwhelming evidence against him.) Metnick, at Tapia's request, filed a motion to withdraw from the case. At a hearing held August 31, 1990, the district court advised Tapia that it was too late in the proceedings to allow Tapia to discharge his privately retained attorney and thus delay the scheduled trial for three months while retaining substitute counsel and allowing him time for preparation. The district court ruled that unless Tapia could hire an attorney who would be prepared to proceed with trial on the scheduled date, Tapia would have to continue with Metnick as his attorney or represent himself at trial.

A few days later, on September 4, 1990, Tapia, still represented by Metnick, pled guilty to the conspiracy charge. In January, 1991, Tapia again asked Metnick to withdraw as his attorney. At this time, Tapia had retained private substitute counsel, Joseph R. Lopez. At a hearing on January 18, 1991, the district court granted Metnick's motion to withdraw and accepted Lopez as replacement counsel. During that same hearing, the court denied Tapia's motion to withdraw his guilty plea.

## II. TAPIA'S APPEAL

### A. The Guilty Plea

Tapia attacks the validity of his guilty plea on a variety of grounds. Initially, he claims that Metnick rendered him unconstitutionally ineffective assistance of counsel, and, in a closely related argument, that his decision to plead guilty was made in reliance upon the erroneous advice from his attorney that he would only be sentenced to 120 months imprisonment. Tapia also alleges that the trial court failed to properly explain the constitutional rights he was waiving by pleading guilty and also failed to warn him that he could not later withdraw his guilty plea, all in violation of Fed.R.Crim.P. 11. Finally, Tapia claims that the trial court committed error in accepting his guilty plea before the probation department had completed the defendant's presentence report.

#### 1. Alleged Attorney Incompetence

We begin by addressing Tapia's claim that his attorney Metnick rendered ineffective assistance of counsel in that he failed to discuss with him the defenses that he might raise at trial or the witnesses that might be called in his defense. Tapia also alleges that Metnick did not allow him to see any of the Government agents' reports concerning the case or copies of the grand jury testimony of the witnesses the Government planned to use against him. He claims the only written material he ever saw was the indictment. Tapia argues that these alleged failures on the part of his attorney demonstrate that his representation was unconstitutionally incompetent.

"An accused has a right under the Sixth Amendment to reasonably effective assis-

tance of counsel in deciding to plead guilty." *United States v. Ayala–Rivera*, 954 F.2d 1275, 1279 (7th Cir.1992); *see also Toro v. Fairman*, 940 F.2d 1065, 1067 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3038, 120 L.Ed.2d 907 (1992). We review Tapia's ineffective assistance claim under a two-part test. *Toro*, 940 F.2d at 1067; *Chichakly v. United States*, 926 F.2d 624, 627 (7th Cir.1991). First, Tapia must establish that his counsel's conduct was "below an objective standard of reasonableness." *Toro*, 940 F.2d at 1067 (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). "Our review of counsel's performance must be highly deferential, and we must avoid the temptation to second-guess counsel." *Id.* Second, Tapia must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068).

■ Tapia did not present to the trial court his arguments concerning his attorney's alleged incompetence *as a claim of ineffective assistance of counsel.*[1] Because the determination of whether or not counsel's performance was constitutionally deficient is a fact-intensive inquiry, we will ordinarily not consider an ineffective assistance claim not previously presented to the trial court. *Ayala–Rivera*, 954 F.2d at 1279. "We make an exception [to this rule] when the issue [of competence] is, as here, sufficiently clearcut." *United States v. Langer*, 962 F.2d 592, 597 (7th Cir.1992).

■ The district court record demonstrates conclusively that Tapia's allegations about Metnick's competence are transparently baseless. During the August 31, 1990 hearing dealing with Metnick's motion to withdraw, Tapia stated that he had examined police reports about his case and had discussed the reports with Metnick and his associate in person as well as in tele-

phone conversations. This is in contradiction to Tapia's assertion on appeal that the only written material Metnick allowed him to see was the indictment. Other statements and admissions by Tapia demonstrate that Metnick acted diligently. At the January 18, 1991 hearing to withdraw his guilty plea, Tapia admitted that as of August 31, 1990, he was aware that the Government had made a tape recording of his telephone call to Underwood arranging a marijuana sale, and that he in fact had listened to the recording. At the August 31st, 1990 hearing, Tapia also conceded that in preparation for trial he had consulted with Metnick or a representative of his office roughly twenty times during the five months since his arrest. Although Tapia was being held in Chicago, and Metnick's office was located in Springfield, Illinois, he had met personally with Metnick or someone from his office five times during that five-month period. Tapia admitted that each time he met with Metnick or his associate they discussed the facts of his case. Tapia also admitted he was advised by counsel that Underwood and Sweet were cooperating with the Government. These facts disclose that Tapia was kept abreast of the developments in his case, and was made painfully aware of the overwhelming evidence the Government had concerning his involvement in the conspiracy. Tapia's allegations of ineffective assistance of counsel are without merit.

■ Tapia advances a second ground for allowing him to withdraw his guilty plea. This argument is a variation on his ineffective assistance of counsel claim. Tapia claims that his guilty plea was involuntary because it was made in reliance on erroneous advice from Metnick that he would only have to serve 120 months imprisonment. Tapia maintains that the district court should have accepted the withdrawal of the guilty plea pursuant to Fed. R.Crim.P. 32(d) which provides, in pertinent part, that "[i]f a motion for withdrawal of a plea of guilty or nolo contendere is made

1. The allegations Tapia makes on appeal about Metnick's performance were in large part presented to the district court as part of his motion to withdraw his guilty plea. The district court thus had the opportunity to review these assertions, but merely as to the withdrawal of his guilty plea, and not in the form of an ineffective assistance of counsel claim.

before sentence is imposed, the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason." "A defendant does not have an absolute right to withdraw his guilty plea, and the decision whether to allow him to do so is with the sound discretion of the trial court." *United States v. Caban,* 962 F.2d 646, 649 (7th Cir.1992) (citation omitted); *see also United States v. Coonce,* 961 F.2d 1268, 1275 (7th Cir.1992). "We will reverse a denial of a motion to withdraw a guilty plea only upon a showing that the court abused its discretion. Thus, a defendant must show that 'fair and just reason' exists justifying his request for withdrawal, and that the district court's findings to the contrary are clearly erroneous." *Caban,* 962 F.2d at 649. An especially important consideration in determining whether a defendant's guilty plea was voluntary is the defendant's answers to the questions posed to him during his guilty plea hearing held pursuant to Fed.R.Crim.P. 11. *United States v. Trussel,* 961 F.2d 685, 689 (7th Cir.1992); *Caban,* 962 F.2d at 649–50. "We accord the record created by a Rule 11 inquiry a 'presumption of verity.'" *Trussel,* 961 F.2d at 689. Voluntary responses made by a defendant when entering a guilty plea are binding. *Id.* "A defendant who presents a reason for withdrawing his plea that contradicts the answers he gave at a Rule 11 hearing faces an uphill battle in persuading the judge that his purported reason for withdrawing his plea is 'fair and just.'" *Id.*

In support of his claim that he believed he would receive a 120 month sentence in exchange for his guilty plea, Tapia cites a motion filed by one of Metnick's associates on December 26, 1990, alleging that the Government prosecutors had indicated that Tapia's sentence would not exceed 120 months. We agree with the district court that Tapia's claim that he pled guilty in reliance on his attorney's advice that he would receive a sentence of 120 months lacks credibility. The defendant personally signed the plea agreement which provided that if "the defendant had a prior felony drug conviction at the time of the offense, it is punishable by a *mandatory minimum*

*sentence of ten years and up to life in prison ...*" (emphasis added). The agreement also stated that "the parties believe that this defendant has a prior felony drug conviction from El Paso County, Texas ... for Unlawful Possession of Marijuana, a felony. Based upon this information, the parties are of the belief that *the mandatory minimum sentencing provision of ten years applies.*" (emphasis added). The plea agreement stated, just above the signature lines, that the "defendant acknowledges that his plea of guilty is completely voluntary, made of his own free will, and that it is made with a full understanding of the contents of this written plea agreement after a full opportunity to discuss this plea agreement with his attorney." Thus, when Tapia signed the plea agreement, full-well understanding that it contained the language referred to above, he should have been well aware that ten years was the *minimum* sentence he could receive. Moreover, at the August 31, 1990 hearing to consider Tapia's request to replace Metnick, held four days before Tapia pled guilty, the defendant asserted that he believed that the Government had offered him a plea agreement under which he would only serve 72 months. An Assistant United States Attorney, Hilary W. Frooman, asked Tapia what led him to believe that such an offer had been made. The following exchange occurred:

"MR. TAPIA: I heard [about the 72 month offer] through my attorney, Mr. Metnick, over the phone, a phone conversation.

MS. FROOMAN: And how do you believe that has changed now?

MR. TAPIA: Well, I was told by Mr. Metnick that it was—that it had changed and that now I was looking at an open plea and *my time would start at ten years. And I could go as far as life depending on what the judge might want.* So I feel there's something definitely wrong, you know, for that to change all of the sudden like that, within a matter of days.

MS. FROOMAN: Are you aware that your sentence is governed by the federal sentencing guidelines?

MR. TAPIA: Yes.

MS. FROOMAN: Were you told when you were arraigned what the maximum possible sentence was for your offense?

MR. TAPIA: Yes.

MS. FROOMAN: *And weren't you told that if you had a prior felony drug conviction that the possible maximum sentence was life imprisonment?*

MR. TAPIA: *I guess so.*"

(emphasis added). This exchange demonstrates that *before* Tapia entered his plea of guilty he was well aware that 10 years was the minimum sentence he could receive and that in fact the actual sentence could be much more severe, even life imprisonment.

At the September 4, 1990 Rule 11 hearing at which Tapia entered his guilty plea, the district court judge explained to Tapia and his codefendants the sentencing implications of their guilty plea to the marijuana conspiracy charge:

"If you have no prior felony drug conviction, then the mandatory minimum of five years must be imposed by the Court. But it could be up to forty years imprisonment with no parole. That's the max. That is, forty years imprisonment, no parole....

Now, *if you have a prior felony drug conviction ... then the mandatory minimum that the Court must impose would jump from five to ten years, and the maximum term of imprisonment jumps from forty years to life imprisonment with no parole.*"

(emphasis added).[2] Later in the hearing, the district judge asked Tapia "[h]as anyone, including your attorneys made any prophesy, prediction, or promise as to what your sentence will or will not be?" Tapia answered, "No, sir." Still later in the hearing, the following colloquy occurred:

"THE COURT: ... Now you are also agreeing with the Government that as far as current information is concerned you believe that you have a prior felony drug conviction from El Paso, Texas, is that right?

MR. TAPIA: Yes, Your Honor.

THE COURT: So that the mandatory minimum sentencing provision of ten years would apply here.

But neither ... [you, your attorneys] and the Government have been able to come to any agreement as to what the applicable sentencing guidelines are, is that correct?

MR. TAPIA: Yes, Your Honor.

THE COURT: All right.

So that what we're talking about here is essentially a straight plea to the single count of conspiracy with the understanding that it looks as though you do have a prior felony drug conviction and a ten year minimum would apply here, isn't that right?

MR. TAPIA: Yes, Your Honor.

THE COURT: ... So this is an agreement between the two of you. And you're simply coming in here and you're going to plead guilty to Count I after I've had it all explained to you, and you understand that if you do have a prior drug conviction, the mandatory minimum of ten years applies, and could go all the way to life, is that right?

MR. TAPIA: Yes, Your Honor."

At the January 18, 1991 hearing held to consider Tapia's motion to withdraw his guilty plea, Tapia, under questioning from Assistant United States Attorney Frooman, again admitted that when he pled guilty he knew that his minimum sentence would be ten years and "would go up from there as high, possibly, as life, or at least eighty years." There is no claim that Tapia is incompetent, or unable to read or understand the English language. A torrent of record evidence demonstrates that Tapia knew full well when he pled guilty that 120 months was the *minimum* sentence he could receive, and there was absolutely no guaranty that it would not be much higher.

---

**2.** This term of imprisonment is provided for in 21 U.S.C. § 841(b)(1)(B).

## 2. *Rule 11 Claims*

█ Tapia also argues that his plea was involuntary because the district court did not adequately inform him of his rights under Fed.R.Crim.P. 11. Rule 11 "requires that a defendant both understand and know the direct consequences of his plea. Sentencing in violation of Rule 11 of course would be an abuse of discretion and would constitute a 'fair and just reason' to withdraw a plea." *United States v. Saenz*, 969 F.2d 294, 296 (7th Cir.1992). However, Rule 11(h) provides that "[a]ny variance from the procedures required by this rule which does not affect substantial rights shall be disregarded." "While district courts are well advised to precisely track the language of Rule 11, ... the failure to do so is not necessarily fatal." *United States v. DeCicco*, 899 F.2d 1531, 1534 (7th Cir.1990). In "reviewing Rule 11 proceedings, matters of reality and not mere ritual should control.... We must strike a balance between a crabbed interpretation that exults form over substance, and an overly technical review which sets a ·procedural trap for the government." *Saenz*, 969 F.2d at 296 (citations omitted). The relevant question is "whether, looking at the total circumstances surrounding the plea, the defendant was informed of his ... rights." *DeCicco*, 899 F.2d at 1534.

Tapia argues that the district court did not inform him, as is required by Fed. R.Crim.P. 11(c)(3), that he had "the right to plead not guilty or to persist in that plea if it has already been made, [and] the right to be tried by a jury ..., and the right to confront and cross-examine adverse witnesses ..." He also maintains that the district court did not explain the nature of the charge as required by Fed.R.Crim.P. 11(c)(1). At the September 4, 1990 plea hearing the district court told Tapia and his codefendants that "[u]nder our Constitution and our laws of this country, you have an absolute right to a trial by jury. No one, including myself as presiding judge here, can deprive you of that right. And unless I accept your plea[ ] of guilty here today this case will continue on my trial calendar.... And it will continue and we will proceed to a trial by jury." The court

also explained that at trial Government witnesses "would testify in your presence before that jury. Each of your counsel could cross examine all of the witnesses for the Government...." Tapia was informed that he had the right to testify in his own defense. The district court told Tapia and his codefendants that in pleading guilty, they were waiving their right against self-incrimination "because I may ask you questions about what you did in order to satisfy myself and the record that you were indeed guilty as charged and you're going to acknowledge to me that you're guilty. You're going to have to say, 'I'm guilty.' " Given these statements, we are convinced that the defendant was advised of the full panoply of his constitutional rights, including his right to a jury trial, his right to enter a not guilty plea, and his right to confront and cross-examine adverse witness. At the plea hearing the district court also directed the assistant United States attorney to explain to the defendants that they were charged with forming "an agreement with others to violate the laws of the United States," specifically conspiring to "transport marijuana as part of that agreement and conspiracy." Tapia's argument that his charged offense was not explained to him is thus also without merit.

█ Tapia also argues that the district court violated another provision of Rule 11. Under Rule 11(e)(1)(B), the Government and a defendant may reach an agreement under which the Government would promise to "make a recommendation, or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon the court." Under Rule 11(e)(2), the court is required to "advise the defendant that if the court does not accept the recommendation or request [made pursuant to Rule 11(e)(1)(B) ] the defendant nevertheless has no right to withdraw the plea." Although Tapia's plea agreement did make reference to Rule 11(e)(1)(B), the agreement also explicitly stated that the "defendant understands that at the time of sentencing the court will not be bound by any recommendation made

by any party, and that the court will be free to impose whatever sentence it deems appropriate up to the statutory maximum." The agreement, which we noted above was signed by Tapia, stated that the "parties have not been able to agree on the application of the sentencing guidelines." The plea agreement contained no reference to an understanding between the parties as to an appropriate sentence to be recommended to the court, and the Government gave no guaranty that it would go along with any recommendation the defendant's counsel might make to the court. At the plea hearing, the district court clearly stated to the defendant that it was not bound by any sentencing recommendation made by the Government or the defendant and that no sentencing agreement had been reached between the Government and the defendant. Tapia's argument that the district court was required to inform him that he did not have the right to withdraw his guilty plea if the court rejected the parties' sentencing arrangement is nonsensical; Tapia and the Government had not reached an agreement as to sentencing, and therefore there was no agreement for the district court to reject.

### 3. *The Presentence Report*

Tapia also suggests that the district court erred in accepting his guilty plea before the probation department's presentence report recommending the Guidelines range applicable to Tapia's offense was prepared. We have, as Tapia points out, noted that the Sentencing Commission's policy statement at § 6B1.1(c) states that in certain circumstances courts ought to defer their decision to accept or reject a plea until there has been an opportunity to consider the presentence report. *United States v. Salva*, 902 F.2d 483, 488 (7th Cir.1990). But § 6B1.1(c) is relevant only in situations where the court is reviewing pleas entered in conjunction with an agreement by the Government attorney 1) to dismiss other charges, 2) make a sentencing recommendation, or at least not to oppose the defendant's sentence request, or 3) recommend that a specific sentence is the appropriate one. U.S.S.G. § 6B1.1(c) (policy state-

ment) (referring to Fed.R.Crim.P. 11(e)(1)(A)(B)(C)). As we noted above, the plea agreement between Tapia and the Government explicitly stated that the "parties have not been able to agree on the application of the sentencing guidelines." Therefore, § 6B1.1(c) is not applicable to this case.

### B. Sentencing Challenge

Tapia contends that the district court committed a blizzard of errors in sentencing him.

### 1. *Amount of Marijuana*

Initially, Tapia argues that the trial judge miscalculated the amount of marijuana attributable to him for sentencing purposes. We will uphold sentences imposed under the Guidelines if the Guidelines are applied to factual conclusions that are not clearly erroneous. *United States v. Centracchio*, 977 F.2d 1061, 1065 (7th Cir.1992). "The amount of drugs involved in a conspiracy is a factual determination we review for clear error only." *United States v. Campbell*, 985 F.2d 341, 346 (7th Cir.1993). "A finding of fact is clearly erroneous only if, after reviewing the evidence, we are left with the definite and firm conviction that a mistake has been committed." *United States v. Hoffman*, 957 F.2d 296, 300 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2315, 119 L.Ed.2d 235 (1992) (citation omitted). The determination of the amount of drugs involved in a conspiracy is made based on a preponderance of the evidence. *United States v. Schuster*, 948 F.2d 313, 315 (7th Cir.1991) (citation omitted).

The trial court found that the drug conspiracy involved 681 kilograms of marijuana. Under U.S.S.G. § 2D1.1(a)(3), offenses involving between 400 and 700 kilograms of marijuana correspond to a base offense level of 28. This is the base offense level the district court assigned to the defendant. For sentencing purposes, "a defendant is responsible for the acts of his co-conspirators if those acts 1) were reasonably foreseeable to the defendant and 2) were in furtherance of the conspiracy."

*United States v. Edwards*, 945 F.2d 1387, 1392 (7th Cir.1991), *cert. denied sub nom. Martin v. United States*, — U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). We "have held defendants liable for the entire quantity of drugs involved in a drug conspiracy ... [when] the defendants were substantially involved in the conspiracy and knew or reasonably should have known of the quantity of drugs handled by the conspiracy." *Id.* at 1394.

From our review of the record we are convinced that the district court's finding that Tapia should be held responsible for the entire 681 kilograms of marijuana was not clearly erroneous. Tapia pled guilty to the drug conspiracy count in the indictment which charged him with distributing only 100 kilograms of marijuana. However, in his plea agreement with the Government, Tapia admitted that the conspiracy involved 400 to 700 kilograms of marijuana. Pursuant to § 3B1.1(a), the district court found that Tapia was a leader and/or organizer of the drug conspiracy, raising his base offense level by four points. Tapia does not challenge that finding on appeal. Sweet, one of Tapia's coconspirators, testified that Tapia was a full partner with him in the drug smuggling operation out of Mexico and that their partnership continued through 1988. Moreover, Tapia conducted drug sales with Wiseman and Underwood in Illinois independent of Sweet. In addition, Tapia admitted in his plea agreement that in March 1990 he transported about 9,000 grams of marijuana from Mexico to St. Louis for distribution in Illinois through Underwood. Tapia has been tied to both ends of the conspiracy, the smuggling from Mexico as well as the actual distribution in the United States, and he does not contest the finding that he was a leader/organizer of the conspiracy. Although in 1988 he had a falling out with Sweet, his original partner, his attempts at marijuana distribution continued up to the moment of his arrest in 1990. The district court did not commit clear error in finding that Tapia is responsible for the entire 681 kilograms of marijuana involved in the conspiracy because Tapia knew of or reasonably should have known of the extent of the conspiracy he helped lead. *See Edwards*, 945 F.2d at 1392.

### 2. *Obstruction of Justice Enhancement*

Tapia also objects to the district court's finding, pursuant to U.S.S.G. § 3C1.1, that he obstructed justice when he gave law enforcement officials a false name and social security number. Section 3C1.1 provides that:

> "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution or sentencing of the instant offense, increase the offense level by 2 levels."

A sentencing court's determination that a defendant obstructed justice is a finding of fact which is reviewed on appeal for clear error only. *United States v. Easley*, 977 F.2d 283, 286 (7th Cir.1992).

The commentary to § 3C1.1 provides that an enhancement is appropriate when the defendant provides "materially false information to a judge or magistrate." U.S.S.G. § 3C1.1, comment. (n. 3(f)). The commentary defines a material information as information which, "if believed, would tend to influence or affect the issue under determination." § 3C1.1, comment. (n. 5). Two days after his arrest, Tapia appeared in court before a magistrate and gave a false name. Had the district court accepted Tapia's ruse, it would not have discovered Tapia's prior criminal activities, and his sentencing range would have been reduced from 168–210 months to 151–188 months. *See* U.S.S.G. Ch.5, Pt.A. These are more than sufficient grounds for supporting a finding of an obstruction of justice.

The commentary to § 3C1.1 also provides that a defendant's sentence should be enhanced when he produces or attempts "to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." U.S.S.G. § 3C1.1, comment. (n. 3(c)). The false social security card Tapia submitted to the court thus also supports the obstruction enhancement.

### 3. *Notice of Prior Conviction*

 Tapia argues that he was not given proper notice of his prior conviction pursuant to 21 U.S.C. § 851 when it was used to enhance his sentence under the Guidelines. The plea agreement between Tapia and the Government stated that "the parties believe that this defendant had a prior felony drug conviction at the time of the offense." Section 851 provides that "[no] person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless ... the United States attorney files an information with the court...." We have recently held that § 851

> "applies to additional penalties provided by a repeater statute over and above the maximum penalty prescribed by statute for a particular offense. It has no application to the effect of prior convictions in deciding the appropriate sentence within such maximum pursuant to the Guidelines."

*United States v. Koller*, 956 F.2d 1408, 1417 (7th Cir.1992). Tapia received a sentence within the statutory range set out in 21 U.S.C. § 841(b)(1)(B)(vii) (maximum of forty years) and therefore we reject his argument.

### 4. *Acceptance of Responsibility*

 Tapia also argues that he should have received a two level reduction in his base offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). Tapia's belated attempt to withdraw his guilty plea is grounds for denial of reduction for acceptance of responsibility. *Trussel*, 961 F.2d at 691. The district court found that Tapia's decision to fire his lawyer and then attempt to withdraw his plea is not consistent with an "affirmative acceptance of personal responsibility for his criminal conduct" as required by § 3E1.1(a). We agree.

### 5. *Lack of Cooperation*

 Tapia also claims the district court erred in relying on the defendant's lack of cooperation with the Government as one factor to support choosing a sentence at the top of the applicable Guidelines range. In *United States v. Klotz*, 943 F.2d 707, 710 (7th Cir.1991), we held that district courts were free to consider a defendant's lack of cooperation in assigning a sentence within the Guidelines range, and we refuse to reconsider that holding today.

### C.

We conclude with the observation that Tapia's appeal reads like a criminal lawyer's primer of defenses. This court has disapproved this sort of buckshot approach where the defendant has only a mere hope that a pellet will strike. *United States v. Balzano*, 916 F.2d 1273, 1297 (7th Cir. 1990). None of Tapia's pellets have found their mark.

### III. PRICE'S APPEAL

 Price's only argument is that he should not have been sentenced under the Guidelines because his involvement in the conspiracy ended before November 1, 1987, the date on which the Guidelines became effective. Price has waived this argument because he failed to timely object either to the probation officer's recommendation in the presentence report or to the district court's finding at the sentencing hearing that the Guidelines were applicable to his offense. *United States v. Bafia*, 949 F.2d 1465, 1476 (7th Cir.1991), *cert. denied sub nom. Kerridan v. United States*, — U.S. ——, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992). Moreover, the plea agreement Price signed with the Government states that the Government would "recommend a sentence toward the low end of the applicable Sentencing Guideline range" and that the Government reserved "the right, in its sole discretion, to make a motion at the time of sentencing for a downward departure from the sentencing guideline range pursuant to § 5K1.1 of the Sentencing Guidelines...." The plea agreement also contained a detailed analysis under the Guidelines concerning the sentencing range applicable to Price. Thus, Price conceded in the plea agreement that the Guidelines applied to his offense.

■ Even considered on its merits, Price's argument is a loser. We have held that the Guidelines are applicable "to crimes referred to as 'straddle offenses' that began before the effective date of the Guidelines and continued afterward." *United States v. Lowry*, 971 F.2d 55, 66 (7th Cir.1992). "[W]here a conspiracy began prior to the effective date of the Guidelines but continued beyond it, the Guidelines apply." *Bafia*, 949 F.2d at 1477. "Moreover, it is equally well-settled that a member of a conspiracy is liable for the acts of his co-conspirators committed in furtherance of the conspiracy." *Id.* Price argues that he did not commit an act in furtherance of the conspiracy after the effective date of the Guidelines. But this contention is irrelevant. Unless a defendant withdraws from the conspiracy, he is still liable for the acts of his coconspirators. *Id.* "Withdrawal requires an affirmative act to either defeat or disavow the purposes of the conspiracy, such as making a full confession to the authorities or communicating to co-conspirators that one has abandoned the enterprise." *Id.* "[A] conspirator will not be permitted by the law to limit his responsibility for its consequences by ceasing, however definitely, to participate.... [M]ere cessation of activity is not enough ..." *United States v. Patel*, 879 F.2d 292, 294 (7th Cir.1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990) (citation omitted). Quiescence does not constitute withdrawal.

The initial burden of proving withdrawal lies with the defendant, *United States v. Agrell*, 965 F.2d 222, 227 (7th Cir.1992), and Price has pointed to no evidence that he withdrew from the conspiracy before November 1, 1987. The Guidelines are applicable to his offense.

## IV. CONCLUSION

We AFFIRM Tapia's conviction and sentence and Price's sentence.