UNITED STATES of America,
Plaintiff–Appellee,

v.

Oliver S. CARTER, Defendant–Appellant.

No. 92–1956.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1992.

Decided June 9, 1993.

Daniel T. Flaherty, Milwaukee, WI (argued), for plaintiff-appellee.

John F. McNally, Jeffrey P. Zarzynski (argued), Hausmann & McNally, Milwaukee, WI (argued), for defendant-appellant.

Before COFFEY and EASTERBROOK, Circuit Judges, and ENGEL, Senior Circuit Judge.*

COFFEY, Circuit Judge.

Oliver S. Carter was convicted of distributing approximately one-quarter ounce of cocaine in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Carter to eighty months imprisonment pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). Carter contends that the dis-

---

* Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

trict court erred in denying his motion to suppress the evidence seized in a search of his home, and in sentencing him. We affirm.

## I. BACKGROUND

On the evening of August 27, 1991, Joseph Wichman [1] and William Lamb, detectives of the Winnebago County, Wisconsin Sheriff's Department, arrested Rosemary Collins for parole violations. At the time of her arrest, Collins was seated in a car in which a "baggie" was found containing what was later determined to be cocaine. Fay Jones, who was with Collins at the time of the arrest, told Detective Wichman that she had given Collins a ride earlier in the evening to a home in the 1400 block of Menominee Drive in Oshkosh, Wisconsin. Jones pointed out the specific house Collins had visited that evening, which turned out to be the defendant Carter's home. Collins told the police that she had received the cocaine from Carter that night. She stated that she had gone to Carter's home, where Carter withdrew a quarter ounce of cocaine from a bag she estimated contained an ounce of cocaine. She purchased the quarter ounce for $400, $200 that evening and $200 on credit. Collins also advised the police that she had been purchasing cocaine from Collins two to three times per week for the past several months.

Later that evening, Wichman and Lamb consulted with Winnebago County District Attorney Joseph Paulus to determine if probable cause existed for a search warrant for Carter's house. Paulus approved the decision to obtain a search warrant, but asked Wichman to conduct a records check of Carter's criminal history. Paulus and Lamb indicated their belief that Carter had a history of weapons and narcotics offenses. Although there were no "open" investigative files on Carter at the drug unit, there were Drug Information Reports. These files are compiled by the police on individuals suspected of involvement with illegal drugs. Carter's file contained some seven or eight reports concerning Carter's activity in the drug world dating back to 1983. No firearms charges

were included in these reports. Wichman also reviewed the Wisconsin computerized criminal records from the Winnebago County Sheriff's Department. The computerized records can be accessed at any time of day, but provide information only from the 1970's onward. These records revealed that Carter had three prior charges for carrying a concealed weapon and four prior narcotics charges, but no record of convictions. The records did not reveal any violent felonies in Carter's history, but District Attorney Paulus stated that he believed Carter had been convicted of armed robbery or attempted murder sometime during the 1960s. [2] Because it was late at night, the earlier, non-computerized records, which could have confirmed Paulus' belief, were unavailable. (At a hearing on the suppression motion, the Government stated that in 1988 a search warrant had been executed at the defendant Carter's home. The police officers were looking for drugs. After the knock and announce during the execution of that search warrant, the officers reported hearing a toilet flushing, leading them to believe that any possible drug evidence might have been destroyed. District Attorney Paulus "made some comments [to Wichman and Lamb] ... that there had been a [previous] search warrant at [Carter's home]" prior to making the application for the search warrant in the instant case. However, Wichman testified that Paulus only mentioned that a prior search warrant had been issued and did not discuss the possible destruction of evidence in the prior search. Wichman learned of the details of the earlier search only after he searched Carter's home.)

Wichman reported to Paulus and to Assistant District Attorney Gritton the results of his research into Carter's criminal history. Gritton then helped Wichman prepare his affidavit in support of a search warrant for Carter's house. The warrant application papers were completed around midnight, and at this time Wichman, Lamb, Paulus, and Gritton proceeded to the home of a Wisconsin

---

1. Wichman was assigned to the Lake Winnebago Area Metropolitan Drug Enforcement Group.

2. The suspicions were correct. According to the Probation Department's presentence report, Carter was convicted of armed robbery in 1963.

state judge. The judge reviewed the warrant application and Wichman's accompanying affidavit, and authorized the issuance of the warrant. As requested in the application, the warrant authorized the officers to enter Carter's house without knocking or announcing their presence.

The next morning, August 28, 1991, Wichman, along with other officers from the Drug Unit and members of the City of Oshkosh Police Department SWAT team, arrived at Carter's home. Wichman, with several SWAT team officers, went to the front door. Wichman pounded on the door with his fist three times, waited five to seven seconds, heard nothing, and then stepped aside as the SWAT team officers used a ram to break the door down. Wichman testified that "immediately as I entered the home; when I actually physically entered, I began calling" out "police officers" several times.[3] A search of the home turned up a quarter ounce of cocaine, 99 grams of opium, marijuana, and drug paraphernalia, including two gram scales, butane burners, and pipes, and the defendant Carter carrying $1,291 in U.S. currency.

Carter moved to suppress the evidence seized in his home, arguing that the Wisconsin state court judge should not have issued a "no-knock" warrant. Wichman testified that before issuing the search warrant, the judge reviewed the warrant application presented by the police. The judge did not ask the officers any questions. Therefore, we must assume that in issuing the no-knock warrant, the judge relied on the following assertion contained in Detective Wichman's affidavit: "based upon his experience and training in the field of narcotics it is a common practice for alleged narcotics dealers to be in possession of guns or other dangerous weapons in relation to the narcotics dealing. As a result, your affiant further requests that he be allowed to enter the residence by announcing that he is a police officer and without knocking."

A magistrate judge initially considered Carter's motion to suppress. The magistrate judge agreed with Carter that Wichman's affidavit statement was not an adequate basis for authorizing a no-knock entry, but nevertheless ruled that the evidence seized was admissible because the police officers relied in good faith on the faulty but facially valid warrant. The district court accepted the magistrate judge's recommendation, explaining that

> "if . . . there were ever a case to which [the good faith exception] would apply, this is it simply because the . . . search warrant included a 'no knock' provision. Clearly from the evidence presented to [the state court judge] the 'no knock' warrant should not have issued, at least based upon the information that was provided to the court in the officer's affidavit. . . . [T]here is nothing in the intervening factual underpinnings of this case to suggest that the officers in their own minds ought to have revisited the factual predicate for implementation of the 'no knock' provision of the warrant."

## II. ANALYSIS

### A. Suppression of Evidence

 The first issue we address is whether the district court properly denied Carter's motion to suppress the evidence seized at his home. The Government's brief does not challenge the district court's conclusion that the no-knock warrant should not have been issued. The Government instead argues the district court correctly admitted the evidence because the police relied in good faith on a facially valid warrant. The magistrate judge's discussion makes clear that he analyzed the issuance of the warrant under 18 U.S.C. § 3109, which provides that

> "[t]he officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of

---

**3.** During the suppression hearing, Wichman was asked why he had knocked on Carter's door when he was executing a "no-knock" warrant. He explained that "when I've been trained to do search warrants, we've always knocked and then announced ourselves and went in; and it was—I erred in doing this. I performed the way I was trained." As we explained above, Wichman is certain that he knocked before entering. However, he did not have a "specific recollection" that he announced his presence and authority before going through the door.

his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

Carter also argues that § 3109 provides the proper framework for the analysis of whether the search was constitutional under the Fourth Amendment.

In *United States v. Andrus*, 775 F.2d 825, 844 (7th Cir.1985), we held that "[s]ection 3109 regulates execution of a federal warrant by federal officers, but does not govern the conduct of state or local police officers executing state warrants." In this case, Carter's home was searched by local police officers executing a state warrant; § 3109 would therefore seem to be inapplicable. *Andrus* also stated, however, citing as support *United States v. Valenzuela*, 596 F.2d 824, 830 (9th Cir.), *cert. denied sub nom. Lizarrage v. United States*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979), that the "fourth amendment ... embraces the principles of § 3109." 775 F.2d at 844. *Valenzuela* itself conceded that section 3109 "is not applicable of its own force" to searches conducted by state officers because the statute "is addressed to entries involving federal officers ... and the warrant here was executed by state officers only." 596 F.2d at 829–30. However, the *Valenzuela* court concluded that in light of *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), "to some extent the no-knock-notice requirements of 18 U.S.C. § 3109 have been incorporated into the Fourth Amendment." 596 F.2d at 830 (internal punctuation omitted). In *United States v. Singer*, 943 F.2d 758, 761 (7th Cir.1991), we, following *Andrus* and *Valenzuela*, stated that "[i]n the context of a no-knock entry, the courts have concluded that § 3109, the federal statute which governs the execution of federal warrants and encompasses the constitutional requirements of the fourth amendment, provides the proper framework for analysis" of the constitutionality of a search conducted by state law enforcement officials.

Neither *Singer* nor *Andrus* explicitly stated that § 3109 is a codification of a Fourth Amendment constitutional rule and thus applicable to all searches, whether conducted by federal or state police. As the Fifth Circuit recently explained in *United States v. Sagaribay*, 982 F.2d 906, 910 (5th Cir.1993), where it declined to "hold that the Fourth Amendment inflexibly incorporates the requirements of § 3109 ...", the Supreme Court has to date never elevated § 3109 to constitutional status. The *Sagaribay* court correctly observed that the Supreme Court

"had an opportunity [in *Ker*] to clarify the relationship of § 3109 to the Fourth Amendment. A plurality refrained from imposing an inflexible Fourth Amendment 'knock and announce' rule incorporating in all circumstances the particular procedures delineated in § 3109. Instead, it held that exigent circumstances justified the search. *Ker*, 374 U.S. at 38–41, 83 S.Ct. at 1632–1634."

982 F.2d at 909. As the *Sagaribay* court pointed out, it was the four *Ker dissenters* who argued that the Fourth Amendment itself required "an announcement by police officers of purpose and authority before breaking into an individual's home," subject to certain exceptions. *Id.* (quoting *Ker*, 374 U.S. at 49, 83 S.Ct. at 1637). The Fifth Circuit concluded that several of the circuits which have found a knock and announce requirement in the Constitution have done so "without close attention to the plurality opinion in *Ker*." *Id.* The Third Circuit in *United States v. Nolan*, 718 F.2d 589, 602 (3rd Cir.1983), conducted a similar analysis of the *Ker* plurality and concluded that "when we consider the divergent purposes of the fourth amendment and section 3109, ... the latter does not embody a constitutional requirement." *See also United States v. Moore*, 956 F.2d 843, 847 (8th Cir.1992) ("[W]hen state officers, acting totally without federal involvement, seize evidence that is later offered in a federal prosecution, ... that evidence [need not] be excluded [even] if the no-knock entry violated § 3109, a federal statute that is more restrictive than the Fourth Amendment[.] ..."); *United States v. Daoust*, 728 F.Supp. 41, 49–50 (D.Me.1989), aff'd, 916 F.2d 757 (1st Cir.1990) ("The *constitutionality* of a forcible entry does not depend upon

ritual adherence to the statutory 'knock and announce' procedures of section 3109").[4]

We need not address the question whether § 3109 applies only to the execution of federal warrants by federal officers or whether it states a constitutional requirement applicable to all searches.[5] Rather than confront this question, we agree with the magistrate judge's determination, accepted by the district court, that the evidence seized at Carter's home was admissible under the good faith exception to the Fourth Amendment. "Suppression is not the inevitable consequence of an illegal search." *United States v. Malin*, 908 F.2d 163, 166 (7th Cir.), *cert. denied*, 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990) (citation omitted). "Evidence is not suppressed when a police officer relies in objective good faith on a faulty but facially valid search warrant." *Id.* (citing *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). "It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." *Leon*, 468 U.S. at 921, 104 S.Ct. at 3419 (citation omitted). "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926, 104 S.Ct. at 3422. "In considering whether the officers

acted in good-faith reliance, we ask whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Pless*, 982 F.2d 1118, 1126 (7th Cir.1992) (citations omitted).

In *United States v. Moore*, 956 F.2d 843, 851 (8th Cir.1992), the Eight Circuit faced a question similar to the one we confront today. The *Moore* court concluded that "the fact that [a] warrant was ... issued without adequate cause to justify authorizing no-knock entry does not mean that the evidence must be suppressed. *Leon* teaches that the evidence is admissible unless [the officer's] affidavit was so lacking in indicia of probable cause that he could not have reasonably believed in its sufficiency." *Id.*

The magistrate judge in the instant case reasoned that

"[a]t the time Wichman applied for the warrant, he along with [District Attorney] Paulus had sufficient information to, in good faith, believe a no-knock warrant would be justified. DA Paulus, in fact, tried to have Wichman verify his beliefs concerning Carter by searching the various criminal records, but this was fruitless due to the late hour. If the judge had requested, additional information was available to support the issuance of the warrant, including the suspicion of destroyed evidence in a prior search, and the suspicions which ... Paulus and the officers had concerning weapons and violence in Carter's history. It is clear to the court that Detective Wichman relied in good faith upon the judge's issuance of the warrant on a no knock basis.... The officers did all they were obliged. They investigated their suspicions as fully as they could at

---

4. The Wisconsin Supreme Court has recognized that the United States Supreme Court "has not yet detailed the minimum constitutional requirements for the manner in which a search warrant is executed," but has observed that "it is generally recognized that the knock and announce rule may be excused only if 'exigent circumstances' exist to justify the no-knock entry." *State v. Williams*, 485 N.W.2d 42, 46, 168 Wis.2d 970, 982 (1992).

5. We note that even when § 3109 does govern a search, "an officer's failure to knock and an-

nounce his presence will be excused ... if 'exigent circumstances' exist which justify executing the search in a no-knock fashion.... Such exigent circumstances exist ... when a suspect's awareness of the search would increase the danger to police officers or others, or when an officer must act quickly to prevent the destruction of evidence." *Singer*, 943 F.2d at 762. We note that it is a common practice for drug dealers to attempt to destroy the drug evidence when they are alerted to an imminent police search.

187

the time they sought the warrant, and having received the warrant, they saw no need to investigate further." [6]

We agree with this analysis, and hold that the district court properly admitted the evidence seized at Carter's home pursuant to the good faith exception to the Fourth Amendment.

### B. Carter's Sentence

#### 1. Amount of Cocaine

■ Carter argues that the district court erred in finding, for purposes of sentencing, that the defendant was responsible for distributing 500 grams of cocaine. For a narcotics offense, the Guidelines provide that conduct relevant to sentencing includes all "acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Under U.S.S.G. § 2D1.1, offenses involving between 550 grams and two kilograms of cocaine correspond to a base offense level of 26. "We will uphold sentences imposed under the Guidelines if the Guidelines are applied to factual conclusions that are not clearly erroneous." *United States v. Price*, 988 F.2d 712, 720 (7th Cir.1993). "The amount of drugs involved in a conspiracy conviction is a factual determination we review for clear error only.... A finding of fact is clearly erroneous only if, after reviewing the evidence, we are left with the definite and firm conviction that a mistake has been committed." *Id.* (citations omitted). The determination of the amount of drugs involved in a conspiracy is made based on a preponderance of the evidence. *United States v. Schuster*, 948 F.2d 313, 315 (7th Cir.1991) (citation omitted).

Carter maintains that the district court's finding relied on the unreliable testimony of Rosemary Collins. Collins testified at trial that from March to August, 1991, she purchased cocaine from Carter "three or four times a week." At Carter's sentencing hearing, Collins stated that she purchased cocaine "two to three days a week a couple of times a

day" and that from January 1991 to August 1991 she was paying Carter over $1,000 per week for cocaine. She testified that Collins would typically have between one-half and one ounce of cocaine available at his home when she made her purchases.

■ The probation department, relying on Collins' testimony, estimated that Carter sold to Collins one-quarter ounce of cocaine three times per week over six months, for a total distribution amount of 552.8 grams. The district court, in accepting the probation department's recommendation, stated that it was aware that "there [were] inconsistencies" in Collins' statements to police and her testimony, but ruled that they were not of "such a nature as to at the sentencing phase ... disregard her testimony." A sentencing judge's credibility determinations are entitled to great deference on review, and we will defer to them unless they are without support in the record. *United States v. Beal*, 960 F.2d 629, 634 (7th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992). The district court considered the testimony at trial and at the sentencing hearing concerning the scope of Carter's drug distributions activity. He did not commit clear error in finding that Carter distributed over 500 grams of cocaine.

#### 2. Obstruction of Justice

■ Carter's final argument is that the district court erred by increasing Carter's base offense level two points for obstructing justice. U.S.S.G. § 3C1.1. The Guidelines indicate that such an enhancement is appropriate if the defendant commits perjury. U.S.S.G. § 3C1.1, comment. (n. 3(b)). A witness testifying under oath commits perjury if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan*, — U.S. ——, ——, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993). If a sentencing court finds that a defendant committed perjury during his trial testimony,

---

**6.** We realize that the state court judge, working in a relatively small community, may very well have been aware of the prior search at Carter's home during which the police suspected that drug evidence had been destroyed, and this knowledge may have influenced his issuance of the warrant in this case.

a § 3C1.1 enhancement is appropriate. *Id.* at ——, 113 S.Ct. at 1117. Carter testified that he never sold any cocaine to Collins. The district court concluded that "there is absolutely no question in the court's mind that Mr. Carter ... gave perjured testimony when he took the witness stand." The sentencing court's determination that a defendant obstructed justice is a finding of fact reviewed for clear error only. *Price*, 988 F.2d at 721. The district court did not commit error in finding that Carter perjured himself.

### III. CONCLUSION

Carter's conviction and sentence are AFFIRMED.