UNITED STATES of America,
Plaintiff–Appellee,

v.

Ronald K. McMILLEN, also known as Mac, and Olanrewaju Raji, Defendants–Appellants.

Nos. 92–2617, 92–2623.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 25, 1993.

Decided Nov. 5, 1993.

Vilija Bilaisis (argued), Office of the U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Michael D. Gerstein, Chicago, IL (argued), for defendant-appellant Ronald K. McMillen.

Robert A. Korenkiewicz (argued), Bruce H. Bornstein, Freedman & Bornstein, Chicago, IL, for defendant-appellant Olanrewaju Raji.

Before CUMMINGS and ROVNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Ronald K. McMillen and Olanrewaju Raji appeal their sentences imposed on resentencing. In *United States v. Edwards*, 945 F.2d 1387 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992), we held that "the conduct for which a defendant can be sentenced under the Guidelines is limited to that conduct which is reasonably foreseeable." *Id.*, at 1389. We vacated the

appellants' sentences and remanded with directions to the district court to consider the scope of the agreement each defendant had with his co-conspirators. We now affirm.

## I. BACKGROUND

The convictions stem from a conspiracy to distribute heroin. The details are set out in *United States v. Edwards,* 945 F.2d 1387, a portion of which we extrapolate here.

From 1986 through December of 1988, Marlowe Cole presided over a heroin distribution system on the south side of Chicago. *Id.,* at 1388. Cole stood at the head of the organization, and was assisted by his live-in girlfriend, Deborah Cain. *Id.,* at 1389–90. This conspiracy "was a sophisticated retail business. It was well organized, tightly knit, carefully managed, and highly profitable." The conspiracy extended to the suppliers, distributors, and drug couriers. *Id.* "Ronald McMillen [was] among those street vendors who received the heroin from the mid-level managers." *Id.* at 1390. "At the other end of the organizational spectrum were the wholesalers who provided heroin for sale by Cole and his underlings. Olanrewaju Raji, [among others] provided the business with a supply of large, wholesale quantities of heroin." *Id.* Cole and his cohorts purchased the wholesale quantities and "diluted the heroin from its wholesale strength, dividing it into user-sized packages," and sent the product on to be sold to users on the streets. *Id.*

McMillen entered into a plea, admitting his liability for conspiracy to distribute in excess of one kilogram of heroin, in violation of 21 U.S.C. § 846. *Id.* at 1389. McMillen's offense level was found to be 32, computed on the basis of the one kilogram of heroin. *Id.* at 1404. McMillen was sentenced to 121 months imprisonment. Raji was found guilty by a jury after a joint trial with five others. The district court found that, for purposes of sentencing, Raji was liable for all of the heroin distributed by the Cole network during the three-year period of time alleged in the indictment, an amount totaling over ten kilograms. Based on this determination, the district court found that Raji's base offense level was 36 and sentenced him to 188 months imprisonment. *Id.* at 1389. McMillen and Raji appealed.

On appeal, we stated that "[t]he district court erred in not considering the scope of the agreement each defendant here had with his co-conspirators." *Id.* at 1395. We held that, under the Sentencing Guidelines, the district court must consider whether the conduct of other co-conspirators, for which the defendant is being held accountable, was reasonably foreseeable to each defendant. *Id.* We directed the district court to "look at the level of commitment each defendant demonstrated towards achieving the conspiracy's goals as evidenced by the scope of the agreement that the defendant entered into with his co-conspirators." *Id.* We vacated McMillen's sentence and remanded for resentencing because he had been deprived of the statutorily-mandated ten days to review the PSI before the sentencing hearing, in violation of Federal Rule of Criminal Procedure 32(c)(3)(A). *Id.,* at 1404. As to Raji, we reasoned:

> While Raji by his own admission sold heroin to Cole, the evidence does not support his involvement until late in 1988. . . . Raji was liable for conspiracy, but his role as co-conspirator was more limited, and he should be resentenced to reflect his late entry into the conspiracy, for the amount of heroin reasonably foreseeable to him must be less.

*Id.,* at 1401.

Judge Grady held a resentencing hearing over a six-day period. The court found that, for purposes of sentencing, McMillen was a participant in the conspiracy from October 6, 1988 through December 2, 1988, for a total of fifty-seven days.[1] McMillen does not contest this finding. The court found that McMillen was chargeable with all of the amounts sold by the conspirators during that time period. Tr. 332. It reasoned:

---

1. McMillen signed a plea agreement admitting to being a member of the conspiracy in the summer of 1988. Tr. 313. Because calculating from a date earlier than October 6 (the date the wire tap commenced) would not have changed McMillen's guideline offense level, those amounts foreseeable to McMillen prior to October 6 were not taken into account. Tr. 309, 330.

It was foreseeable to him ... because of his presence on the scene at the workhouse and his knowledge of what he and others were doing at the workhouse and what was being delivered to the workhouse by other members of the Cole organization.

Tr. 333. The court relied on the calculations presented by the government, consisting of numerous taped conversations among the co-conspirators. The evidence demonstrated that during this time period there were approximately thirty-four transactions, or an average of 4.25 transactions per week. Of these transactions, only eleven recordings provided sufficient evidence to ascertain the amount of heroin that was being distributed. From the tapes, it was ascertained that there was a total of 433.24 grams of heroin distributed in the eleven transactions, or an average of thirty-nine grams of heroin per transaction. Multiplying this average by 4.25, the average number of transactions per week, the court found that distribution of 160 grams of heroin per week was reasonably foreseeable to McMillen. The court multiplied this figure by the eight weeks McMillen was a member of the conspiracy, for a total of 1,280 grams of heroin during that period. Tr. 330–33.

With respect to Raji, the court relied upon the tape-recorded conversations Raji had with Cole and Cain. These recordings did not commence until October 5, 1988. However, based on earlier conversations reflecting similar transactions, as well as evidence of cash deposits to Raji's bank accounts over a period of time and cash payments made for substantial purchases, the court inferred that Raji was a member of the conspiracy from June 6, 1988 through November 7, 1988, for a period of twenty-two weeks. Tr. 688, 714–16. During this period, Raji was Cole's sole supplier. Tr. 699, 716. Raji does not contest these findings. The district court found that the Cole organization distributed "at least one ounce of heroin per week....", Tr. 716, and therefore Raji distributed no less than 616 grams of wholesale strength heroin to the Cole organization over the twenty-two week period. *Id.* Although the evidence showed that there was an additional amount of heroin purchased by Cole that he, his family and employees used, the district court declined to include this heroin because there was no evidence as to its quantity. Tr. 706.

The wholesale heroin delivered by Raji was generally cut three or four times prior to its sale on the streets; on occasion, it was cut twice (so that the heroin mixture sold weighed three times as much as the uncut heroin). Tr. 429–30, 554, 566, 575–76, 655, 658. There was no evidence of Raji's participation in or observation of the cutting procedure, nor of statements by him concerning it. As the court said, a wholesale supplier "knows that it will be diluted to some degree because he knows that the dealer he is supplying would not be able to turn a profit without some degree of dilution." Tr. 716. The court found that Cole would need to cut the heroin twice in order to give him sufficient profit to make dealing worth his time and effort. *Id.* The court deemed it foreseeable to Raji that the heroin he delivered to Cole would be cut to that extent and that the product the conspiracy would distribute would weigh three times as much as the uncut heroin Raji supplied. Thus, the court found that, for the twenty-two week period, "the amount of heroin that [Raji] conspired to possess with the intent to distribute was 1,848 grams." Tr. 672, 717.

Based on the 1,280 grams of heroin foreseeable to McMillen, the court determined that his base offense level was 28. McMillen received credit for acceptance of responsibility, although the court declined to characterize his role in the conspiracy as minor. Tr. 363–64. The court concluded that his total offense level was 30 with a criminal history category of I, and sentenced him to ten years imprisonment, five years supervised release and a special assessment of $50. Tr. 364. Based on its finding that "the amount of heroin that [Raji] conspired to possess with the intent to distribute was 1,848 grams," Tr. 672, the court determined that Raji's base offense level was 32. Raji received no credit for acceptance of responsibility, and the court found that his role in the conspiracy was "significant and substantial." Raji was sentenced to 140 months in prison, five years supervised release, and an assessment of $450.

## II. DISCUSSION

■ "Our review of sentences imposed under the Guidelines is deferential. We will uphold a sentence so long as the district court correctly applied the Guidelines to findings of fact that were not clearly erroneous." *United States v. Duarte,* 950 F.2d 1255, 1262 (7th Cir.1991), *cert. denied,* ── U.S. ──, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992) (citing *United States v. Vopravil,* 891 F.2d 155, 157 (7th Cir.1989)); *United States v. Centracchio,* 977 F.2d 1061, 1065 (7th Cir.1992). "Ascertaining the quantity of drugs involved in an offense for the purpose of sentencing is a factual determination subject to the clearly erroneous standard." *Duarte,* 950 F.2d at 1265 (quoting *United States v. Buggs,* 904 F.2d 1070, 1078 (7th Cir.1990)). "We reverse or vacate under this standard only when on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *Id.* (citations and quotations omitted) (brackets in original). The determination of the amount of drugs involved in a conspiracy is based on a preponderance of the evidence. *United States v. Price,* 988 F.2d 712, 720 (7th Cir.1992); *United States v. Rosa,* 946 F.2d 505, 509 (7th Cir.1991) (government bears burden of showing by preponderance of evidence amount of drugs involved in an offense).

### A. McMillen

■ The application notes to Section 2D1.4 of the United States Sentencing Guidelines provide:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.4, Application Note 2 (1991). A district court's determination of the quantity of drugs involved in an offense for sentencing purposes is a factual determination subject to the clearly erroneous standard.

*Centracchio,* 977 F.2d at 1065 (citing *Buggs,* 904 F.2d at 1078). A defendant convicted of a drug distribution conspiracy is held accountable, for purposes of sentencing, for the acts of co-conspirators if those acts 1) were reasonably foreseeable to the defendant and 2) were in furtherance of the conspiracy. *Edwards,* 945 F.2d at 1392; *Price,* 988 F.2d at 720.

■ McMillen contests the district court's finding that distribution of 1,280 grams of heroin was reasonably foreseeable to him during his participation in the conspiracy. McMillen contends that there were a number of plausible alternatives, "[n]one ... would be more likely than not the correct one." McMillen's Opening Brief, at 14–15. He argues that the district court averaged the eleven largest transactions to derive the 160 grams per week figure, although the court had a duty to err on the side of caution. *Id.* at 14 (citing *United States v. Wilson,* 900 F.2d 1350 (9th Cir.1990)); *United States v. Frederick,* 897 F.2d 490 (10th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 171, 112 L.Ed.2d 135 (1990); *United States v. Walton,* 908 F.2d 1289, 1302 (6th Cir.), *cert. denied,* 498 U.S. 989, 990, 111 S.Ct. 530, 532, 112 L.Ed.2d 541 (1990) ("when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution"). The court's failure to be cautious, he contends, constitutes clear error. Brief at 16.

McMillen does not cite to any portion of the record that demonstrates that the district judge selectively chose the eleven largest transactions on which to base his calculations. To the contrary, it appears that the court relied on these particular transactions because they provided sufficient detail in which to ascertain the quantity of heroin involved. Indeed, the court took great pains to review the evidence transaction by transaction. Tr. 107–234. The court then considered evidence concerning similar transactions, for which the quantity could not be ascertained. Because these transactions were similar in nature, the court inferred that these transactions involved a similar quantity of heroin. It was the district

judge's function to weigh the evidence and make a finding supported by the preponderance of the evidence. The judge's decision that the preponderance of the evidence supported his finding that the transactions involved similar quantities of heroin was not unreasonable.

■ There is nothing to suggest that the court did not act cautiously. To the contrary, the court did not take into account those amounts foreseeable to McMillen prior to October 6, 1988, although McMillen admitted in his plea agreement that he was working for Cole in the summer of 1988. In addition, the court did not take into account the amounts of heroin that were supplied to the co-conspirators for their personal use rather than being sent to the workhouse. Tr. 209–10. We believe the district court did act cautiously. In any event, McMillen does not argue that the court's determination is not supported by a preponderance of the evidence. Because the court's estimate is plausible, as McMillen concedes, we do not believe the decision is clearly erroneous. *Centracchio*, 977 F.2d at 1065–66.

■ McMillen also raises a number of specific contentions regarding the court's finding. McMillen asserts that during the relevant time period, there were only eighteen transactions, and not thirty-four, as the district judge found. McMillen states,

> This is supported by the tapes which indicate a single package of heroin being referred to on multiple tapes over several days. Further, this is also supported by Jimmy Lee Coleman's testimony that he would hold a package of heroin, give half of it to the workhouse and retain the other half until the workhouse had sold the first part of the package.

Brief, at 12. To the contrary, each package was determined through numerous telephone calls between the co-conspirators, some taking place over a number of days. Where the evidence was unclear as to whether an amount was included in a package already counted, or whether it was a new package, the judge did not count the amount in question. Tr. 163–64. However, where the court found that the telephone conversations reflected separate deliveries, as opposed to ref-erence of an earlier delivery, such finding was not unreasonable. Tr. 170–71, 227–31. We give great deference to the district court's interpretation of the facts. *Duarte*, 950 F.2d at 1266 ("[w]e ordinarily give great deference to the court's judgment when it must choose between one of two inconsistent statements of fact in imposing sentence"). These findings are not clearly erroneous.

■ McMillen further argues that the court's findings concerning Raji support his contention that the total distribution he can be held accountable for is less than one kilogram of heroin. The court found that Raji was the sole supplier of heroin from the spring of 1988 to November 7, 1988, and that Raji delivered at least one ounce of raw heroin per week during this twenty-two week period, for a total of 616 grams of raw heroin. The court concluded that it was foreseeable to Raji that the heroin would be cut at least twice, and therefore Raji was accountable for 1,848 grams of heroin. McMillen contends that, based on these calculations, Cole distributed an average of eighty-four grams per week (1,848 grams divided by the twenty-two week period Raji was involved). Thus, McMillen cannot be held accountable for 160 grams of heroin per week, as the judge determined.

The district court had a number of alternative methods for ascertaining the amount of heroin reasonably foreseeable to McMillen. The court's calculations for McMillen were based on the amount of heroin that was ascertainable from the recordings of eleven of the transactions. There is nothing to suggest that these transactions were not indicative of the other transactions that took place from October 6 to December 2—the period in which McMillen was a member of the conspiracy. The court found this calculation to be "reasonable" and instructed counsel that the 160 grams per week figure would be used for the other defendants, unless there was a particular reason why such information should not be considered. Tr. 334. In calculating the amount of heroin supplied by Raji, the court found "that the Cole organization distributed at least one ounce of raw heroin per week during this period of time." Tr. 716 (emphasis added). This estimate was

calculated by working backwards from the figures used for McMillen. Tr. 707. The determination of the amount of drugs involved is made based on a preponderance of the evidence. *Price, supra* at 720; *Duarte,* 950 F.2d at 1263. Regardless of the method used in calculating the amount foreseeable to Raji, the district judge's decision that the preponderance of the evidence supported his findings as to McMillen was not unreasonable.

McMillen additionally contends that if we agree with his position that the amount of heroin foreseeable to him was less than one kilogram, then on remand the district court must reconsider whether there is a factual basis for his guilty plea to at least one kilogram of heroin. He also argues that on remand the court should reconsider whether he should be given a two-point reduction for minimal participation. Because we think Judge Grady's finding concerning the amount of heroin was not clearly erroneous, we need not address these claims.

### B. Raji

■ Raji was held responsible for the quantity of heroin sold on the streets in its user-strength form. The evidence showed that, prior to its sale at retail, the heroin had been cut three or four times, although at times only twice. Tr. 49, 429–30, 566, 658. The district court determined that Raji knew that the heroin would "be diluted to some degree because he knows that the dealer he is supplying would not be able to turn a profit without some degree of dilution." .Tr. 716. The court looked to what Raji could reasonably anticipate the wholesale strength heroin to be diluted "that would return a significant, indeed, substantial profit" to

Cole. *Id.* According to the evidence, if Cole purchased an ounce of heroin at wholesale strength for $3,000 and sold it uncut, he would sell it for approximately $1,800, at a loss of $1,200.[2] Tr. 503. If the heroin was cut once, Cole would have a gross profit of $600 which, given his overhead and the risks involved, "would yield no [net] profit." Tr. 504–05, 716–17. The district judge concluded that if the heroin had been cut twice for a gross profit of $2,400, Cole would have a profit that would be reasonably foreseeable to a supplier. Tr. 505, 514. He found that Raji could reasonably foresee that Cole would cut the heroin twice. Tr. 716–17.

Raji contends that the record does not support the district court's finding that he knew Cole cut the heroin prior to distribution. There is no evidence that he helped Cole or others redistribute the drugs, nor was the money he earned based upon a share in the success or failure of the network. Rather, Raji asserts, the only evidence is the judge's presumption that Cole could only make a substantial profit if the heroin were cut. Raji argues that his interest did not go beyond that of making a sale to Cole and that the scope of his agreement with the conspiracy must encompass more than the mechanics of downstream commerce. He additionally contends that, even if he was subjectively aware of the cutting, this was insufficient to include the cutting within the scope of his agreement with Cole. Raji refers to *Edwards,* where we stated:

> [R]easonable foreseeability means more than subjective awareness on the part of individual defendants that Cole headed a long-standing and successful heroin distribution network. Given the notoriety of the Cole network, each defendant here can be ascribed with said awareness.... Of par-

---

2. Raji sold heroin in wholesale quantities of one or more ounces at a purity of 40–60 percent and at a price of approximately $3,000 per ounce. Tr. 257, 261. At the retail level, the quantities of heroin sold on the street were in packages containing one-fifth of a gram ("dimes") for $10, one-quarter of a gram ("halves") for $20, or one-half of a gram ("sixes") for $35, in purities of 7–11 percent (user strength). Tr. 27, 28–29, 50, 255–57, 263. A typical user would purchase up to two "dimes" per day, Tr. 255–56, and would not ingest heroin at its wholesale strength. Tr. 258.

To dilute the wholesale strength heroin so that the heroin would range from 7–11 percent in purity, the heroin would need to be cut at least three times. Tr. 258. Indeed, the court could have concluded that it was foreseeable to Raji that the heroin would be cut enough times so that it could be ingested by a user. Based on the evidence, the court could have concluded that it was foreseeable to Raji that the heroin would be cut at least three, if not four, times prior to its sale on the streets.

ticular importance in determining the level of commitment on the part of an individual defendant is the scope of the agreement between that defendant and his co-conspirators.

*Edwards,* 945 F.2d at 1393–34.

Here, Raji played an essential role in the Cole conspiracy by acting as Cole's sole supplier for a period of twenty-two weeks. The deliveries by Raji of wholesale-strength heroin to the Cole organization were not sporadic. The evidence showed that there were at least twenty-one packages delivered to the warehouse between October 6 to November 7, 1988. The evidence also demonstrated that Raji was in constant contact with Cole, the central organizer of the heroin distribution scheme. The evidence shows that Raji made a number of phone calls to both the residence where Cole stored his packages, as well as the workhouse where Cole based his drug operation. Tr. 683, 715. It appears that Raji was being kept apprised of the circumstances affecting the existence of the drug operation. For example, Cain called Raji after the police executed a search of the workhouse and arrested one of the street dealers. Tr. 678. Clearly, Raji's knowledge and commitment to the conspiracy went deeper than the mere sale of heroin to Cole.

In light of Raji's involvement, we do not believe Raji was so naive about the mechanics of Cole's distribution scheme that he could not foresee that Cole would cut the heroin prior to selling it on the streets. Without an ongoing supply of heroin from Raji, Cole could not have continued his operation. However, if Cole was unable to resell the heroin at a price sufficient to cover his expenses and to take into account the risk involved, Raji would not have continued to profit from his sales to Cole. We think the court took a modest approach by holding Raji accountable for the heroin twice cut. Although Cole could make a profit by cutting the heroin twice, the evidence demonstrated that the heroin was typically cut three or four times prior to its sale. It was not clear error for the district court to conclude that Raji could reasonably have foreseen that the heroin would be cut twice prior to its sale on the streets.

Based on the foregoing discussion, we AF-FIRM.