**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Franklin D. ROBINSON and Brian
S. Beal, Defendants–Appellants.**

Nos. 93–2745, 93–2778.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 7, 1994.

Decided July 12, 1994.

Christopher T. Van Wagner, Office of U.S. Atty., Madison, WI (argued), for U.S.

T. Christopher Kelly, Madison, WI (argued), for Franklin Robinson.

Robert Glickman, Madison, WI (argued), for Brian S. Beal.

Before CUDAHY and COFFEY, Circuit Judges, and NORGLE, District Judge.*

COFFEY, Circuit Judge.

A grand jury indicted defendants Brian S. Beal and Franklin D. Robinson for conspira-

---

* The Honorable Charles R. Norgle, District Judge for the Northern District of Illinois, is sitting by designation.

cy to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2. Both defendants filed motions to suppress evidence, challenging the legality of the stop prior to their arrests and the seizure of the controlled substance. The district court denied the motions to suppress. Robinson entered a conditional guilty plea on Count I, the conspiracy count, reserving his right to appeal the district court's ruling on the suppression motion. Count 2 was dismissed as to Robinson in exchange for his guilty plea. Robinson was found guilty and sentenced to 126 months' imprisonment. Beal proceeded to trial, was convicted on both counts, receiving a concurrent sentence of 170 months' imprisonment on each count. Beal and Robinson were also sentenced to a five-year period of supervised release following the completion of their respective terms of imprisonment. Beal appeals his sentence and conviction while the defendant Robinson appeals only his conviction. We affirm each of the defendants' convictions as well as Beal's sentence.

## I. BACKGROUND

■ Robinson and Beal filed motions to suppress the evidence against them based upon an allegedly illegal stop that escalated into an illegal arrest. This motion was referred to a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B), for a report and recommendation. Following an evidentiary hearing, the magistrate judge filed his report on April 30, 1993, recommending that the motions to suppress the evidence and statements be denied. Robinson filed timely objections to the magistrate judge's report and recommendation, while the defendant Beal failed to file his objections. On May 11, 1993, the district court adopted the magistrate judge's recommendations and denied the motions to suppress the physical evidence and the statements. Two days after the district court issued its order adopting the magistrate judge's suggestions, Beal filed late objections to the magistrate judge's recommendation. Beal's untimely filing of objections to the magistrate judge's recommendation usually would be construed as a waiv-

er of his right to appeal the district court's order adopting the report and recommendation. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Videos Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538 (7th Cir.1986). The government has not claimed prejudice by Beal's late filing and the objections were not "egregiously late," thus we will not impose the sanction of dismissal for missing the deadline by two days. *See Hunger v. Leininger,* 15 F.3d 664, 668 (7th Cir. 1994) (failure to meet deadline for filing objections does not mandate dismissal if objections are not egregiously late and the opponent has not been prejudiced). Testimony and evidence presented at the suppression hearing revealed the following facts.

On March 3, 1993, officers of the Madison, Wisconsin Police Department executed a search warrant at an apartment at 2105 Allied Drive, Madison, Wisconsin, rented by a Dwight Walker. The officers found cocaine base in the apartment and arrested the lessee, Dwight Walker, for possession of the drug. Detective William Searls questioned Walker about his drug source. Walker told Searls that he obtained the cocaine from two men who were staying at the Highlander Motel on the Beltline Skyway, and that the men had been selling the drugs out of his apartment. Walker informed Searls that both men were black and that one of the men was named Brian, who was approximately five feet ten inches tall with a heavy build, while the other, named "D" or "Derail," was about five feet tall with a small build and straight black hair combed straight back over his head to his collar in a pompadour style. Walker stated that the previous night the two men had sold a large amount of cocaine base out of his apartment, and that a third man named Vincent was involved in the operation. Walker described Vincent as a heavyset black male with a light complexion who was about six feet in height and weighed between 180 to 200 pounds. The officers involved in the drug investigation who obtained Walker's description of Derail, Brian, and Vincent testified at the hearing on the motion to suppress that they believed there was a description of their clothing, but they could not recall the specifics. No witness

testified that Walker provided them his cohorts' approximate ages.

Walker indicated that he had known Derail and Brian for about six months. Derail was Walker's sister's boyfriend, and lived upstairs with her in another apartment at the Allied Drive address. Walker saw Derail almost daily and was in contact with Brian every few weeks. As Walker described the operation, Brian would transport the cocaine to Madison from Chicago. Derail and Brian, who were friends as well as partners in crime, would then distribute the cocaine base to their Madison customers, and usually kept large amounts of cocaine and money on or near their person.

Within the month prior to the search at Walker's apartment, a confidential informant revealed to Detective Searls that a person named Brian from California was residing in the area of 2105 Allied Drive and was selling cocaine base. The Dane County, Wisconsin Sheriff's Department had also informed Searls that one of its undercover officers had been purchasing cocaine base at 2105 Allied Drive from a short black male named "D," who was around five feet tall and had a very small frame and straight hair combed back.

In an attempt to arrest Walker's suppliers, Sergeant Peterson of the Madison Police Department instructed two of his officers, Parrell and Frey, to set up surveillance at the Highlander Motel, which Walker had identified as the base of operations of his cocaine suppliers. Peterson gave Parrell and Frey a description of Brian and Derail and told them to stop anyone matching those descriptions in order that they might ascertain their identity. Peterson informed the officers that both men were black and that the one named Brian was approximately five feet ten inches tall with a heavy build, while the other, named "D" or "Derail," was about five feet tall with a small build and straight black hair combed straight back over his head to his collar in a pompadour style. Both officers were aware that the surveillance was related to a drug investigation.

As part of their surveillance, Parrell and Frey went to the front desk of the motel to inquire if two black males matching the descriptions were registered as motel guests.

Yinchang Wang, the motel's owner, told them that two men matching the descriptions were staying in Room 49 at the east end of the motel. Wang stated that the room was registered to a Vincent Townsend. Parrell and Frey set up surveillance on March 3, 1993, the same day as Walker's arrest, in an unmarked truck one and a half blocks behind the motel. Officers Kinney and Endl were assigned to assist in the surveillance, setting up a position west of the motel.

At approximately 11:45 a.m. on March 3, two more policemen, Dane County police officers Brown and Twing, joined in the surveillance of the Highlander Motel. Peterson instructed them to watch for a heavy-set black male with a light complexion who was about six feet in height and weighed between 180 to 200 pounds suspected of being involved in the drug operation at 2105 Allied Drive. Neither Brown or Twing had any knowledge that there were other suspects under surveillance. Brown and Twing parked their car and patrolled the area on foot.

Approximately five to ten minutes after instituting the surveillance, Brown saw a black male who in his opinion did not match the description he had been given exit the east entrance of the motel, pick up some snow and throw it, and return to the motel. Brown shortly thereafter observed one tall black male and a short black male depart from the same exit. The shorter of the two men was the one who had picked up the snow moments earlier. Although neither of the two men matched the description of the heavyset black male they were looking for, Brown and Twing informed the other four officers conducting surveillance that two black males had exited the motel from the door they had under surveillance.

Upon hearing Brown and Twing's radio message that two black males of notably disparate height were leaving the east motel entrance, Frey and Parrell drove to that location. The two officers drove down a frontage road at about 35 miles per hour and caught sight of the two men walking in front of them on the road. Officer Frey noticed that the two men matched the description

they had been given of the two black men of markedly different height, but could not immediately discern if they fully matched the descriptions because the shorter suspect's hair was covered by a stocking cap, but the suspect's hair stuck out the back of the cap to his shoulders. The two suspects stepped to the side of the road and onto an adjacent snow covered grassy area. The officers pulled their truck off the road in front of the men on foot, blocking their path.

The suspects appeared somewhat surprised and stopped walking as they observed the uniformed officers exit their truck and approach them. Parrell addressed his conversation to the taller man while Frey talked with the other man approximately five feet away. Frey noticed that the shorter man had long hair sticking out from behind his cap. Frey asked the shorter man his name, and he identified himself as Franklin Robinson and provided his address and date of birth. Frey asked Robinson if he would consent to a search and assured Robinson that he did not have to consent to the search. Robinson agreed to the search and Frey found nothing on Robinson.

In response to Frey's inquiries, Robinson stated that he had been staying at the motel in Room 49, and that he had recently checked out of the room, and was on his way to 2105 Allied Drive. When Frey asked Robinson why he wasn't carrying any luggage, Robinson replied that he did not have any belongings. During this ten to fifteen minute interview, Robinson complained persistently that he was feeling cold and wanted to get out of the cold.

Beal identified himself to Officer Parrell as Vincent Townsend and stated that his date of birth was October 7, 1966. Beal consented to a search, and Parrell discovered an Illinois traffic ticket in his pocket issued to a Vincent Townsend that listed his date of birth as August 8, 1965. Parrell again asked Beal for his birth date and Beal provided a third date of birth. Parrell concluded that because Beal was less than truthful and because he and Frey were the only two officers on the

scene, Beal should be handcuffed to prevent him from fleeing. Parrell told Beal that he thought Beal was lying and that he would be handcuffed for their mutual safety, but that he was not under arrest. Beal responded to the accusation by stating that his name actually was Jarrell Townsend.

Parrell continued his search of Beal and now discovered a small amount of marijuana in his pants pocket. At this point Officer Parrell informed Beal that he was under arrest for possession of marijuana. Parrell also located a motel receipt, a second traffic ticket, as well as a key to Room 49 of the Highlander Motel. Parrell radioed the Illinois Department of Transportation, which provided a physical description of Jarrell Townsend. Parrell testified that Beal matched this description. Parrell called a phone number Beal provided and spoke with a person who identified himself as Vincent Townsend. Townsend gave Parrell the same date of birth for Jarrell Townsend that Beal had provided and Vincent Townsend's description of Jarrell Townsend's features matched Beal.

A short time after the stop and the interview began, Officers Twing and Brown drove up and joined their partners Parrell and Frey. Frey briefed the officers on what had occurred. Brown directed each person to identify his footprints in the snow so that he could track the prints to check for discarded contraband. Brown tracked Beal's and Robinson's footprints back to the motel but found nothing.

Because of Robinson's continuing complaints about the cold, Frey and Brown offered to allow Robinson to sit in Brown's running squad car until they had completed their investigation. Robinson accepted the officers' offer, entered the squad car, and never requested an opportunity to leave. Shortly thereafter Brown entered the car with Robinson and they engaged in small talk. After conversing with Robinson for a few minutes, Officer Brown left the car to speak with Officer Frey. As he exited and stepped onto the curb, Brown noticed a bag of "gem packs" [1] containing cocaine base ly-

---

1. Officer Frey and Officer Brown testified that gem packs are small translucent blue plastic bags

used to package cocaine base.

**780**

ing in a footprint in the snow. The footprint had been made by Brown when he travelled with Robinson on the way to the car. No one had stepped on the gem packs since they had been dropped, and Brown had not noticed the bag during his prior tracing of footprints.

After Brown related this discovery to the other officers, Frey, who was in command of the investigation at the scene, told Brown to detain Robinson. At this juncture in the investigation, Brown placed handcuffs on Robinson and informed him that he was now being investigated for drugs, but that he was not under arrest. In spite of this information Brown read Robinson his *Miranda* rights. Robinson stated that he was willing to talk to Brown, and denied that the drugs found in the snow were his. Brown offered to let Robinson talk to a detective, and Robinson expressed his willingness to do so.

While Brown was engaged in a colloquy with Robinson, Parrell continued his investigation of Beal. When Parrell asked Beal if he would consent to a search of the motel room, Beal replied that he and Robinson were no longer occupying the room. Beal claimed that they had checked out of the motel and they were on their way to the front desk to drop off the key when the officers stopped them. When Frey overheard this conversation, he decided to go to the motel to check the purportedly unoccupied room. Frey requested a key from the front desk and proceeded to open the door to the room. He noticed luggage stacked in a corner of the room, concluded it was still occupied, and closed the door.

Approximately five minutes after Frey returned to where the other officers were located, he happened to see a man exiting the motel and heading for a waiting taxi. The man resembled someone who was present during the execution of the search warrant the night before. Upon seeing him, Beal exclaimed "There is your drug dealer." The officers approached the man, patted him down, and discovered a handgun. Approximately the next ninety minutes were devoted at the scene of the investigation to dealing with this new individual and his gun possession charge. After interviewing the new suspect, the officers decided that he had no involvement in the drug operation under investigation.

During this time period, Detectives Searls, Hughes, Smithson, and Peterson joined the officers. Searls went to the squad car where Brown and Robinson were seated and Brown informed Searls that Robinson was willing to speak to him. Searls advised Robinson that he was not under arrest but that he was handcuffed for safety reasons. Robinson stated that he understood and wished to cooperate. Robinson advised them that he was staying in Room 49 of the motel with Beal, but that he was just an innocent bystander. When Searls asked Robinson why Beal was uncooperative, Robinson stated, "Probably because there is drugs [*sic*] in the room." Robinson told Detective Searls that the drug referred to was cocaine base.

Robinson consented to a search of what he regarded as his half of the motel room and his luggage. Searls explained that he was seeking consent for a search of the common areas [2] of the room used by both Robinson and Beal, and not merely one half of the room. Robinson consented to a search of the common areas of the motel room using a drug-sniffing dog, and stated that the officers would probably find cocaine base during the search. Searls then contacted a state prosecutor who told him that the officers should confine their search to the common areas of the room and Robinson's luggage only.

**2.** Although Beal does not challenge Robinson's authority to consent to a search of the areas of the room used by both defendants, any such challenge would be unavailing:

When individuals possessing common authority over an area agree to permit an entry or search, their consent " 'is valid as against the absent, nonconsenting person with whom that authority is shared.' " *United States v. Duran,* 957 F.2d 499, 503 (7th Cir.1992) [quoting *United States v. Matlock,* 415 U.S. 164, 170, 94 S.Ct. 988, 992, 39 L.Ed.2d 242 (1974)]. In *Matlock* the Supreme Court explained that common authority "rests ... on mutual use of the property by persons generally having joint access or control for most purposes." [*Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7]. *United States v. Rosario,* 962 F.2d 733, 735 (7th Cir.1992).

Searls brought Robinson to the room and he identified his luggage. In Robinson's presence, police dogs searched the room by sniffing the common areas and Robinson's luggage without finding the scent of drugs. At this time Robinson volunteered that the drugs were probably near the radiator. Detective Hughes advised Robinson that a drug-sniffing dog had already searched the radiator, and that he felt Robinson was sending them on a "wild goose chase." Robinson suggested they, "Check the corner. It's probably under the carpet," and pointed to the southwest corner of the room, which was a common area of the room used by both Beal and Robinson. Detective Smithson found a plastic bag containing cocaine base and cash under the carpet in the corner where Robinson had directed them to search. Robinson stated, "That's Brian's dope." The amount of cocaine base found in the motel room was later analyzed and found to weigh 24.9 grams, and the amount discovered earlier in the snow was analyzed and determined to weigh 1.48 grams.

Detective Searls then went to the squad car where Beal was sitting and informed him of his *Miranda* rights. Beal consented to speak to Searls. Searls told Beal about the results of the search and that Robinson had told the officers that Beal had rented the room and that Beal ran the drug operation. Beal responded by claiming that Robinson was the mastermind and he was simply hired on as Robinson's bodyguard. While being conveyed to the police station, Beal reiterated his pique at Robinson's statements incriminating Beal. At the police station, Searls read Beal and Robinson their *Miranda* rights once again. Both men consented to speak with the police. Searls took photographs of the two defendants and showed the photos to Dwight Walker, who identified both men as his drug suppliers.

## II. ISSUES

Beal challenges only that aspect of the district court's order denying his motion to suppress finding that the initial encounter between the police and Beal when the officers approached the suspects was not a full-blown arrest but at most a *Terry* stop. Beal also alleges that the district court made two errors in sentencing him under the Sentencing Guidelines. Initially, Beal claims that the sentencing court relied on unreliable evidence in determining that the quantity of cocaine base attributable to him for purposes of calculating his base offense level under the Sentencing Guidelines ("Guidelines" or "U.S.S.G.") was at least 104 grams. The district court arrived at this figure by adding the amount discovered in the snow and the motel room, 25.38 grams, to the minimum amount the court estimated the defendants distributed during the existence of the conspiracy from June 1, 1992, to March 3, 1993. The sentencing court's estimate of the amount distributed was based on witness statements as to the duration and frequency of the drug deals. Second, Beal argues that the sentencing court clearly erred in enhancing his base offense level for obstruction of justice under U.S.S.G. § 3C1.1, for perjuring himself while testifying at trial concerning his role in the offense and the reason for his presence in Madison, Wisconsin.

Robinson challenges the district court's denial of his motion to suppress on two grounds. First Robinson alleges that the police encounter from its inception to the time the gem packs of cocaine base were found in the snow was neither consensual nor a valid *Terry* stop. Second, Robinson asserts that there was no probable cause supporting his eventual arrest for possession of cocaine base.

## III. ANALYSIS

### A. Motions To Suppress

We review a district court's ruling on a motion to suppress evidence for clear error. *United States v. Tilmon,* 19 F.3d 1221 (7th Cir.1994); *United States v. Wilson,* 2 F.3d 226, 229 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1615, 128 L.Ed.2d 341 (1994). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Tilmon,* 19 F.3d at 1224 (citing *United States v. Rice,* 995 F.2d 719, 722 (7th Cir.1993)).

### 1. Initial Encounter With Police

The magistrate judge submitted to the district judge proposed findings of fact and a recommendation that the defendants' initial encounter with the police was consensual, and that, in all events, the encounter would pass muster even if deemed to be a *Terry* stop. The court accepted this recommendation and also accepted the magistrate judge's recommendation that the encounter, which could be deemed consensual but was nonetheless supported by a reasonable suspicion, did not become a *Terry* stop until the officers asked to search the suspects. The district court found that the suspects were not arrested until Officer Parrell discovered Beal possessed marijuana and announced he was under arrest and Officer Brown found the base cocaine outside the squad car and proceeded to handcuff Robinson after reaching the conclusion that he was the person who had abandoned the drug. Robinson and Beal contend that the initial stop was neither consensual nor a valid investigatory detention.

■■■ An investigatory stop not rising to the level of an arrest is allowed if the officer detaining an individual is "able to point to a reasonable suspicion of criminal activity." *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968); *United States v. Adebayo,* 985 F.2d 1333, 1339 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993). When evaluating whether a *Terry* stop was reasonable, the facts must be "judged against an objective standard: would the facts available to the officer as the moment of the seizure or the search 'warrant a man of reasonable caution

in the belief' that the action taken was appropriate." *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–81. The reasonableness of a particular stop depends on the extent of the intrusion at the particular moment in the course of events on the individual's rights as well as on the reason for the restraint. *United States v. Chaidez,* 919 F.2d 1193, 1197 (7th Cir.1990), *cert. denied,* 501 U.S. 1234, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991). The Supreme Court emphasized in *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981), that "the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person[s] stopped of criminal activity." If officers stop individuals and seek their voluntary cooperation through noncoercive questioning, however, the encounter is not a seizure under the Fourth Amendment. *Adebayo,* 985 F.2d at 1337. When evaluating whether a stop is consensual, a court determines whether the encounter occurred in a public place, whether the suspect consented to speak to the officers, whether the officers informed the individual that he was not under arrest and was free to leave, whether the individuals were moved to another area, and whether there was a threatening presence officers of several officers and a display of weapons or any physical force.[3] *Id.*

■■■ We are satisfied that from its inception, the encounter between Robinson, Beal, and officers Frey and Parrell was consensual. The initial encounter occurred

---

**3.** The officers use of handcuffs on Beal and Robinson is not an issue in this case because neither defendant raised it on appeal. Beal only complains that the initial approach of the police in their truck constituted a seizure; he does not claim that his Fourth Amendment rights were abridged when handcuffs were placed on him. Even if Beal had challenged his handcuffing as an arrest unsupported by probable cause, "[w]e have been unwilling to hold that the handcuffing of a suspect without probable cause to arrest is unlawful per se." *See United States v. Smith,* 3 F.3d 1088, 1094 (7th Cir.1993) (listing cases holding that handcuffing a suspect does not automatically convert a *Terry* stop into an arrest); *Tom v. Voida,* 963 F.2d 952, 957–58 (7th Cir. 1992) (listing factors warranting handcuffs during an investigatory stop: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight") (quoting *Graham v. Connor,* 490 U.S. 386, 394–97, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989)); *United States v. Glenna,* 878 F.2d 967, 972 (7th Cir.1989). As we stated above, because Beal has not challenged his handcuffing, we need not determine whether it was lawful. Furthermore, we agree with the district court's ruling that Robinson's encounter with the police escalated into an arrest supported by probable cause the moment he was handcuffed after Officer Brown's discovery of the cocaine base lying in the snow.

along the side of a road in a public area, the defendants agreed to talk to the officers, the defendants were not moved to another area until after they were arrested, only two officers approached the two defendants, and there was no display of weapons or force. *See Adebayo,* 985 F.2d at 1338–39; *United States v. Williams,* 945 F.2d 192, 195 (7th Cir.1991); *United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990) ("The police do not violate the fourth amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting some questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.") (citation omitted), *cert. denied,* 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991). That the officers chose to drive onto the side of the road rather than park their vehicle in the middle of the street while questioning the defendants does not suggest that the officers were doing anything other than seeking Beal and Robinson's voluntary cooperation. The circumstances surrounding the encounter would not compel a reasonable person to believe that he could not ignore the police presence if he wished and go about his business. There was no discernible intrusion on the suspects' freedom of movement in this case warranting a finding that the simple act of parking a police vehicle on the side of the road prevented them from leaving. *See United States v. Packer,* 15 F.3d 654, 656 (7th Cir.1994) (pinning suspects between two police cars thereby preventing departure constituted *Terry* stop); *United States v. Lechuga,* 925 F.2d 1035, 1039–40 (7th Cir. 1991) (placement of police vehicles directly in front of and directly behind defendant's vehicle is a *Terry* stop). The totality of circumstances suggests that a reasonable person would have felt free to leave under the initial circumstances of the encounter.

■ The district court correctly ruled that a *Terry* stop was justified from the outset, however, because of the information Frey and Parrell had obtained from other officers and from their own observation of the defendants. At the time of the encounter, Frey and Parrell knew that other officers had executed a search warrant at 2105 Allied Drive that morning and had recovered drugs and arrested Dwight Walker. A superior officer, Searls, had informed them that the arrested apartment dweller had identified his drug source as two black males who were selling cocaine base out of the previously referred to Allied Drive location and were staying at the Highlander Motel. The officers were informed that the suppliers' names were Brian and "D" or "Derail." The suspect named Brian was described as approximately five feet ten inches tall with a heavy build, while the other suspect, named "D" or "Derail," was about five feet tall with a small build and straight black hair combed straight back over his head to his collar in a pompadour style.

Officers Parrell and Frey interviewed the motel's owner and learned that two persons matching the description of the drug suppliers were staying in Room 49, located in the east end of the motel. The owner stated that "Vincent Townsend" had rented the room. Officer Brown saw Beal and Robinson exit the east end of the motel and informed Frey and Robinson. Defendants Beal and Robinson, who were identified walking together, met the physical description of the drug dealers identified by Walker, the buyer arrested at 2105 Allied Drive. When initially questioned, defendant Beal identified himself as Vincent Townsend. In light of these facts and circumstances and the information the officers collectively possessed, we agree with the trial court's finding that the officers were fully justified in stopping Beal and Robinson for questioning.

■ Robinson argues that the *Terry* stop was unreasonable in duration and scope and ripened into an arrest unsupported by probable cause because from the time the officers first stopped him to the time he entered the squad car about twenty to thirty minutes passed. Robinson contends that he should have been released at this point despite the officers' increasing suspicions based upon Beal's deceptive responses to questions. Officer Brown discovered the cocaine base in the snow approximately five minutes after Robinson entered the car.

For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests. *See United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 1574–76, 84 L.Ed.2d 605 (1985); *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2641–42, 77 L.Ed.2d 110 (1983); *Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion). If a *Terry* stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it ripens into a de facto arrest that must be based on probable cause. *See Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1574–75; *United States v. Smith,* 3 F.3d 1088, 1095–96 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994).

As Robinson notes, a critical factor in evaluating the intrusiveness of a stop is the length of the detention. *See Sharpe,* 470 U.S. at 675–76, 105 S.Ct. at 1568–70; *Place,* 462 U.S. at 709, 103 S.Ct. at 2645–46; *Smith,* 3 F.3d at 1095–96. No bright-line rule, however, determines the outer time limit of a permissible *Terry* stop. *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575–76; *Place,* 462 U.S. at 709, 103 S.Ct. at 2645–46. Instead, a court considering the reasonableness of a particular detention's duration must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575; *Place,* 462 U.S. at 709, 103 S.Ct. at 2645–46. The Supreme Court has cautioned that a reviewing court should not "indulge in unrealistic second guessing" as to the methods law enforcement officials use to conduct their investigations. *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1576. "The question is not simply whether some ... alternative [method] was available, but whether the police acted unreasonably in failing to recognize or pursue it." *Sharpe,* 470 U.S. at 687, 105 S.Ct. at 1576.

We hold that the district court correctly determined that Robinson's twenty-minute detention while Beal's questioning was continuing was not unreasonable under *Terry.* During the twenty minutes that passed between the initial stop and Robinson's decision to sit in the heated squad car without making any request to leave while Beal's questioning continued, the officers questioned both suspects about their identities and activities, contacted other officers to inform them of the encounter, and made a number of calls to verify Beal's identity. Based upon all of the information they had at the time of the stop as well as Beal's conduct and misleading answers, the officers had reason to believe the defendants were operating in the same drug operation together. The interview with Robinson justified further investigation because Robinson matched the physical description of "Derail"; he admitted he was staying in Room 49 of the Highlander Motel; and he revealed that he was on his way to 2105 Allied Drive, which the officers knew to be the cocaine base distribution point. Robinson has failed to cite any evidence or case law that would call into question the district court's conclusion that the duration of the stop was no longer than necessary to complete the stop's investigative purpose. Robinson's argument essentially is premised upon unsupported speculation that "Frey apparently wanted to hold Robinson so that one of his superiors would have an opportunity to question him." First, the district court determined that Brown's offer to Robinson to talk to a detective was not made until *after* he was under arrest. Second, the twenty-minute duration was reasonable considering the circumstances of the investigation. *See Sharpe,* 470 U.S. at 687–88, 105 S.Ct. at 1576–77 (rejecting bright-line time limit for *Terry* stops and holding that twenty-minute detention not too long to be justified in light of the time reasonably needed to effectuate law enforcement purposes); *United States v. Chaidez,* 919 F.2d 1193, 1198 (7th Cir.1990) (finding ten to fifteen minute detention reasonable), *cert. denied,* 501 U.S. 1234, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991); *United States v. Sterling,* 909 F.2d 1078, 1082–83 (7th Cir.1990) (sporadic questioning, as opposed to continual interrogation, for forty-

five minutes is permissible); *United States v. Davies,* 768 F.2d 893, 901–02 (7th Cir.) (forty-five minute detention justified to satisfy the investigative purposes of the stop), *cert. denied,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985).

### 2. Probable Cause for Arrest

The district court ruled that the stop escalated into an arrest when Robinson was placed in handcuffs and read his *Miranda* rights immediately after Officer Brown had discovered the plastic bag containing the gem packs of cocaine base on the ground in the snow in the immediate vicinity of the police vehicle. Robinson quibbles with the district court's ruling by alleging that his arrest occurred when he entered the squad car with Brown moments before to get out of the cold. Further, Robinson maintains that the arrest was unsupported by probable cause because it was "wildly speculative" and "not probable" for the officer to conclude that Robinson was the person who dropped the cocaine base on his way into the squad car. Probable cause exists if under the totality of circumstances it was reasonable for the officer to believe that a particular individual had committed a crime. *United States v. Burrell,* 963 F.2d 976, 987 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992).

Robinson's claim that the offer to sit in the squad car to keep warm was a coercive tactic to "isolate" him in a private area controlled by police and was the functional equivalent of an arrest has no merit. No evidence adduced at the hearing on the motion to suppress suggests that the offer to sit in the squad car was anything more than a humanitarian response to Robinson's repeated complaints that he was cold. We agree that there was no probable cause to arrest Robinson at the time he entered the squad car, but we also agree with the district court's ruling that the arrest did not occur until moments later when Detective Brown found the cocaine base near the squad car in a footprint in the snow that he had made while accompanying Robinson to the squad car. Brown found the cocaine base in an area where only he and Robinson had been moments before.

Brown then consulted with Frey regarding the discovery, and the officers concluded with good reason that Robinson could have been the only person who possessed the drug and dropped it to avoid detection on his person. Only then did Brown handcuff Robinson and inform him of his *Miranda* rights. Either Detective Brown or Robinson dropped the cocaine in the snow; the district court did not clearly err by concluding that the police reasonably believed that Robinson was the culprit and that Brown's handcuffing of Robinson was an arrest supported by probable cause.

Robinson argues that he could not have dropped the cocaine because Frey had previously searched him and had not found any drugs. Although the previous search did not yield any contraband, it was not unreasonable for the court to conclude that Robinson probably successfully concealed the bag containing the drugs during the previous search and that he anxiously jettisoned it on his way to the squad car. In sum, we agree with the district court that the police had probable cause to arrest Robinson after the cocaine base was discovered in the snow. We hold that the trial court was not guilty of committing clear error when denying the defendants' motions to suppress.

### B. Beal's Sentencing Challenges

Beal contends that the district court relied on unreliable information in determining the quantity of drugs attributable to him under U.S.S.G. § 1B1.3, for purposes of sentencing. In addition, Beal claims that the sentencing court erred when it determined that he perjured himself while testifying at trial concerning his role in the offense and his statements to police officers and that a two-level enhancement of his sentence was warranted under U.S.S.G. § 3C1.1 for obstruction of justice.

### 1. Attributable Drug Amount

A district court's calculation of the quantity of drugs attributable to a defendant for purposes of sentencing is a finding of fact, which we review under a clearly erroneous standard. *United States v. Montgomery,* 14 F.3d 1189, 1196 (7th Cir.1994);

*United States v. Cedano–Rojas,* 999 F.2d 1175, 1179 (7th Cir.1993). We will not second guess the sentencing court's credibility determinations because the sentencing judge has had

> the opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, rather than looking at the cold pages [of a transcript].

*Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2991, 125 L.Ed.2d 686 (1993). The government bears the burden of establishing the quantity of drugs by a preponderance of evidence. *United States v. McMillen,* 8 F.3d 1246, 1250 (7th Cir.1993).

Beal claims that the district court clearly erred in estimating the amount of cocaine base delivered to Madison as part of the same drug operation to be 104 grams of cocaine base. Beal contends that the only amount he can be held responsible for is between 20 to 35 grams of cocaine base, which represents the amount confiscated by police and the estimate of the amount sold in this one trip to Madison. The district court is required to enhance a defendant's base offense level by aggregating drug amounts "to account for 'relevant conduct,' which includes drugs from any acts that 'were part of the same course of conduct or common scheme or plan' as the convicted offense, regardless of whether the defendant was charged with or convicted of carrying out those acts." *United States v. Duarte,* 950 F.2d 1255, 1263 (7th Cir.1991) (interpreting U.S.S.G. §§ 1B1.3(a)(2) and 3D1.2(d)), *cert. denied,* —— U.S. ——, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992); *see also United States v. Rivera,* 6 F.3d 431, 445 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1098, 127 L.Ed.2d 411 (1994).

In evaluating Beal's relevant conduct, the sentencing court found that Beal was responsible for distributing or conspiring to distribute at least 104 grams of cocaine base in the course of several visits to Madison from Chicago. As support for its findings, the district court relied on the trial testimony of Detective Searls concerning Beal's confession of involvement, as well as information in the Presentence Report ("PSI") based on information provided by other witnesses, including Dwight Walker, Daphne Walker, Detra Brown, and a confidential informant.

During her interview with Detective Searls, Daphne Walker, Dwight Walker's sister, stated that Beal brought cocaine base from Chicago to Madison to sell it with Robinson's assistance for approximately a year prior to their arrest. She revealed that Beal would come to Madison to sell cocaine base up to two times a month. Detra Brown, Dwight Walker's girlfriend, informed Searls that Walker allowed Beal and Robinson to sell cocaine out of his apartment on Allied Drive for at least six or seven months. A confidential informant interviewed by Searls reported having purchased cocaine base from Brian Beal on at least fifteen or twenty occasions and from Franklin Robinson on at least nine occasions beginning in the summer of 1992.

Searls' trial testimony and the information provided by other witnesses to Searls established that the police had seized approximately 26.38 grams of cocaine from Beal's motel room and in the snow during the initial stop. After his arrest, Beal made statements to police that he was Robinson's bodyguard during drug-selling trips to Madison; that he and Robinson were at the motel in Madison to sell cocaine base for Vincent Townsend, Beal's cousin; and that Beal had sold cocaine base in Madison in this manner on at least four or five previous occasions. Based upon this evidence and the information gained from the statements made to the police by Robinson and Walker, the court found that Beal was involved in the distribution of cocaine base from June 1, 1992, until his arrest in March 1993. The court noted that the evidence established that Beal had been in Madison at least once or twice a month for a period of five or six months and that the defendant distributed approximately 25 grams of cocaine base at least once or twice a month. The court generously chose to limit the amount Beal was responsible for, however, to that amount actually seized in the snow and the motel room (25.38 grams) from the

conspirators during this arrest multiplied by the minimum of four trips Beal admitted making to Madison for the purpose of selling drugs.

The district court did not commit clear error in relying on Searls' testimony concerning Beal's post-arrest admissions rather than Beal's testimony at trial. The jury, like the sentencing court, obviously also found Searls' testimony more credible than Beal's, and Beal fails to challenge the corroborating confessions obtained from Robinson and Walker. "The district court, as the trier of fact, not only has the authority but is in the best position to determine the amount of narcotics attributable to the conspiracy or any member of it." *United States v. Tolson*, 988 F.2d 1494, 1502 (7th Cir.1993); *United States v. Mumford*, 25 F.3d 461, 476 (7th Cir.1994) (holding court may estimate amount of drugs based on evidence presented at sentencing). Beal correctly notes that he has a constitutional right to be sentenced on the basis of reliable information, *United States v. Westbrook*, 986 F.2d 180, 182 (7th Cir.1993), which is reiterated in § 6A1.3(a) of the Guidelines, see U.S.S.G. § 6A1.3(a) (courts may "consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy"). Nonetheless, Beal fails to identify or delineate the unreliable nature of Searls' testimony, which was corroborated by several other witnesses and a confidential informant. While Beal's trial testimony conflicted with Searls', the district court, like the jury, was entitled to find Searls' testimony to be more reliable than Beal's. We hold that the district court's determination of the drug amount attributable to Beal for purposes of sentencing was not clearly erroneous.

## 2. Obstruction of Justice Enhancement

██ Beal challenges the district court's two-level enhancement of his base offense level during sentencing for obstruction of justice. The defendant testified at trial that his presence in Madison had nothing to do with drug sales. Rather, Beal stated he sojourned to Madison simply to inveigle a girlfriend to return to Chicago and to sell a gold chain. Based upon the conflict with Beal's concession to Searls after his arrest that he was accompanying Robinson on his drug sales as his bodyguard, the district court found that Beal perjured himself while testifying at trial on a material matter with the willful intent to provide false testimony and enhanced his sentence accordingly. Beal claims that the district court mischaracterized his trial testimony and that this undermines the court's determination that he committed perjury. We disagree. The district court noted in its statement of reasons attached to the PSI that Robinson had stated that Beal assisted him in the distribution of cocaine in Madison for approximately six months prior to their arrest. Our review of the record reveals that Beal's trial testimony concerning his number of visits to Madison was vague, and could be interpreted to be anywhere from two visits prior to the March trip resulting in his arrest, to "several" visits. The district court did not clearly err in finding that Beal grossly underestimated the number of visits to Madison. Furthermore, the material conflict resulting in the perjury enhancement was Beal's denial that he ever came to Madison to deal drugs, not whether he came to Madison two or "several" times.

Section 3C1.1 of the Guidelines provides that "if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense" a two-level increase in the defendant's base offense level is warranted. One example of conduct warranting enhancement listed in Application Note 3(b) to U.S.S.G. § 3C1.1, is "committing, suborning, or attempting to suborn perjury."

In *United States v. Dunnigan*, —— U.S. ——, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the Supreme Court upheld the constitutionality of the obstruction of justice sentence enhancement for perjury at trial, and held that if a defendant objects to a § 3C1.1 enhancement for his testimony at trial, the sentencing court must review the evidence and make independent findings that establish a willful impediment to or an obstruction of justice, or a willful attempt to impede or obstruct jus-

tice using the federal definition of perjury. *Id.* at 1117. The Court defined perjury as "a witness testifying under oath or affirmation ... [who] gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* at 1116; *see also United States v. Pedigo,* 12 F.3d 618, 628–29 (7th Cir.1993); *United States v. Carson,* 9 F.3d 576, 583–84 (7th Cir.1993).

The district court made the findings required by the Supreme Court in *Dunnigan,* evaluated Beal's testimony against that of Searls and Franklin Robinson's confession, and found that Beal's testimony was incredible and contrary to his earlier admissions of culpability. The district court did not err in applying the two-level Guidelines enhancement for obstruction of justice.

## IV. CONCLUSION

The defendants' convictions and Beal's sentence are

AFFIRMED.